THE CONNECTICUT COMPANY *vs.* THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY ET ALS.

Third Judicial District, New Haven, June Term, 1919.
PRENTICE, C. J., RORABACK, WHEELER, BEACH and GAGER, Js.

Debenture bonds issued by a street railway corporation, provided that if it should mortgage the whole or any part of the property and franchises then owned by it, "this debenture and the indebtedness evidenced thereby shall participate in the security of such mortgage upon equal terms with all other indebtedness or evidence of indebtedness to be secured by such mortgage." Shortly thereafter, in May, 1907, this corporation "merged with and in itself" the New York, New Haven and Hartford Railroad Company, taking the latter's name, and in 1910 conveyed its street railway properties acquired through such merger to the plaintiff, The Connecticut Company, a mere arm or adjunct of the railroad company, which owned all its stock, directed and managed all its affairs at will, and to which it was in all respects subject. In a suit to determine the validity and effect of this debenture provision, it was *held*:—

1. That such clause created a personal obligation upon the part of the

street railway company which precluded it from giving a mortgage of its aforesaid property without providing therein for the participation of all the debenture holders in that security; and that under the circumstances detailed in the record, justice and fair dealing demanded that the same obligation should rest upon the plaintiff, which was in reality a mere *alter ego* of the street railway company and raised up, owned and controlled by it to do its will and advance its interests.

2. That as between the street railway company and the purchasers of its debentures, the covenant created an equitable lien, or an equitable charge in the nature of a lien, upon the property and franchises owned by that company at the respective dates of such issues, which continued after such property had been in form transferred to its successor, the Connecticut Company. (*Two judges dissenting.*)

By an amendment of its charter in 1915 (17 Special Laws, p. 367), the railroad company was required to secure by any mortgage that it might thereafter make, all bonds, debentures and notes previously issued and at such time outstanding, of which it was the maker, "or which it had assumed through merger or consolidation with the original and principal obligor." *Held* that the imposition of this obligation upon the railroad company—however beneficial it might be to the holders of the debentures in question— could not discharge or modify the contract obligations of the street railway company or its successor, the Connecticut Company; and that the same was true of a similar Act of like date passed by the Legislature of Massachusetts.

Argued June 10th—decided July 31st, 1919.

SUIT to determine the validity of claims made by the holders of outstanding debentures issued by the Consolidated Railway Company, which were alleged by the plaintiff to constitute a cloud upon the title to its properties and to prevent it from raising funds by way of mortgage, brought to and reserved by the Superior Court in New Haven County, *Warner, J.*, upon the facts stated in the pleadings, for the advice of this court. *Judgment advised in favor of the debenture holders.*

The Thompson Tramway Company was chartered by the General Assembly of this State in April, 1901. In January, 1902, its corporate name was changed to the Worcester and Connecticut Eastern Railway Company. Prior to September of that year the company

came to be owned by the New York, New Haven and Hartford Railroad Company, and all the street railway and electric companies in Connecticut which that company had then purchased, owned or controlled, were merged in it. By Special Acts of the General Assembly passed in 1903 and 1905, the charter powers of the Worcester and Connecticut Eastern Railway Company, known after May, 1904, as the Consolidated Railway Company, were greatly enlarged, so as to include the powers of a holding company with authority to purchase, hold or guarantee the stock, bonds, leases and franchises of any other transportation or electric corporation, to merge, consolidate and make common stock with other corporations, and to issue its bonds and full paid stock at its par value. From a time prior to May, 1904, the railroad company continued to own all the capital stock of the Consolidated Company, being $500,000 in amount, elected its officers and directors, all of whom were officers and directors of the railroad company, and controlled its affairs as absolutely as though the two companies were one and the same corporation.

May 18th, 1904, the name of the Railway Company was, at the instance of the railroad company, changed to the Consolidated Railway Company, hereinafter referred to as the Consolidated Company. On that date the railroad company caused the capital stock of the Consolidated Company to be increased to $10,000,000, for the purpose of taking over and consolidating into it the various electric and street railway companies which the former company had then acquired or should thereafter acquire, together with their franchises and property. Then and thereafter the railroad company did so consolidate a number of street railway and electric companies, including the Fair Haven and Westville Railroad Company, an unmortgaged corporation

whose property the complaint more especially concerns, and caused the same, with their property rights and franchises, to be conveyed to the Consolidated Company.

Beginning July 1st, 1904, and ending January 1st, 1906, the Consolidated Company made five separate issues of its coupon debenture bonds, aggregating in amount $13,047,000, of which $10,887,000 are now outstanding and unpaid. These bonds were declared to be issued for the purpose of purchasing the stock or bonds of other corporations owning or operating electric railways, or the property rights and franchises of such corporations, and for other proper purposes of the company. Each of the bonds contained the following clause: "The Consolidated Railway Company further promises that if it shall hereafter mortgage the whole or any part of the property and franchises by it owned on . . . [date of debenture], except to renew existing mortgages, this debenture and the indebtedness evidenced hereby shall participate in the security of such mortgage upon equal terms with all other indebtedness or evidences of indebtedness to be secured by such mortgage." The date inserted in each of the debentures corresponded with the date of the issue to which it belonged.

May 31st, 1907, acting under authority obtained from the General Assembly, the Consolidated Company merged with and in itself the New York, New Haven and Hartford Railroad Company, and thereupon changed its name to that which the absorbed railroad company had borne. This corporation will, for convenience sake, be referred to hereinafter as the New Haven Company. Its capital stock consisted of the combined outstanding capital stock of the two merging corporations; and that of the Consolidated Company, which was all in the treasury of the New Haven Com-

pany or in that of another subsidiary of that company, the New England Navigation Company, became, by the terms of the merger, original capital stock of the New Haven Company.

By this merger the New Haven Company became the owner of all the capital stock of the Thomaston Tramway Company, consisting of 2,500 shares of the par value of $100 per share. The name of the Tramway Company was thereupon, by the procuration of the New Haven Company, changed to The Connecticut Company. The New Haven Company thus became the owner of the Connecticut Company, and all the various electric and street railway companies, together with their rights, property and franchises, which had been held by the Consolidated Company prior to the merger.

From June 1st, 1907, to on or about February 28th, 1910, the Connecticut Company operated the street railway properties owned by the New Haven Company, as a subsidiary company owned and controlled absolutely by the New Haven Company and as its agent, acting under a lease agreement which was executed between them. During all this period the New Haven Company owned all the stock of the Connecticut Company, consisting of 2,500 shares of the par value of $100 each, elected its officers and directors, who were likewise officers and directors of the New Haven Company, and controlled its affairs and policies absolutely. During this period the net earnings of the Connecticut Company from the operation of the street railway properties, amounting to a large sum, save only one item of $600,000 which was received by the New Haven Company in 1910 as a dividend upon the capital stock of the Connecticut Company, were turned over to the New Haven Company under the lease agreement. Before the termination of this period the Connecticut

Company had invested in its own lines and property a sum exceeding $300,000, for which payment was made out of the funds furnished by the New Haven Company, either old or new.

In February, 1910, the New Haven Company, as a preliminary to and a part of its plan to consolidate its Connecticut street railway properties into one subsidiary company, caused the capital stock of the Connecticut Company to be increased from $250,000 to $40,000,000. In further pursuance of its plan of consolidation, the New Haven Company on February 28th, 1910, sold and conveyed to the Connecticut Company all of its street railway properties in Connecticut owned by it and formerly owned by the Consolidated Company, with two or three minor exceptions. In exchange for the property thus conveyed, all of the $40,000,000 of capital stock of the Connecticut Company, except a small amount already held by the New Haven Company in its treasury, was delivered to it. All of this stock and all of the obligations of the Connecticut Company for borrowed money remained in the hands of the New Haven Company until June, 1913, when the transaction detailed in the next following paragraph was had. After February 28th, 1910, the Connecticut Company ceased to operate its Connecticut street railway companies and properties as lessee of the New Haven Company, and thereafter operated them as a subsidiary of the latter company. The transfer of properties to the Connecticut Company was made in pursuance of a written agreement authorized by that company's stockholders in January, 1910. On that date and on the date when the transfer of properties was made the New Haven Company was the sole stockholder of the Connecticut Company, and the latter's directors were persons who were directors of the New Haven Company and the chief executive officers of the Connecticut Com-

pany were persons who were officers of the New Haven Company.

In June, 1913, the New Haven Company, in furtherance of its various purposes, transferred to the New England Navigation Company all of the $40,000,000 of stock of the Connecticut Company. This latter company was likewise a subsidiary of the New Haven Company, and as such continued to hold the capital stock of the Connecticut Company down to the time when the court decree hereinafter referred to was entered. During all the time covered by this transaction the stock of the Navigation Company was owned by the New Haven Company and it was managed, controlled and officered in the same manner as were the other subsidiary companies of the New Haven system as hereinbefore described. During that time the New Haven Company was the equitable owner of all of said stock, and through the Navigation Company, as its intermediary, made use of the same with other securities held by it for financing further purchases of property and for purposes of its own.

October 17th, 1914, the United States District Court for the southern district of New York, in a suit brought by the United States against the New Haven Company, its subsidiaries and others, entered a decree providing for the separation of the management and control of certain properties held by the New Haven Company and its subsidiaries, including the street railway properties, from that of the New Haven Company, and looking to the ultimate termination of the ownership of these properties by the New Haven Company. By the terms of that decree the Navigation Company was directed to forthwith assign and transfer to certain persons as trustees the $40,000,000 capital stock of the Connecticut Company which stood in its name. These trustees were to hold these shares and exercise all the

powers in the management of the company which the owners of the shares therein were entitled to exercise until such time as a sale thereof should be effected. It was also provided that all reasonable expense incurred by the trustees in the execution of their powers and duties should be paid by them, and that any balance of income over expenditures be turned over to the Navigation Company, its legal representatives or assigns. In the event that there should prove to be no such balance, and the trustees should be without funds for the payment of the expenses of operation and payment of compensation to themselves, their employees and counsel, it was provided that the New Haven Company should from time to time advance such sums as should be necessary for that purpose, as the trustees should request or the court determine.

A substantial part of the debentures issued by the Consolidated Company, and of the proceeds received from the sale thereof, were used in making exchange for, or for the purchase and cancellation of, large amounts of outstanding bonds of the various street railway companies purchased. They were also used to purchase additional street railway and electric company properties, and in defraying the cost of the construction, improvement and equipment of a large number of such properties already owned by the Consolidated Company at the dates of the several debenture issues.

The Aetna Life Insurance Company and the Travelers Insurance Company, owners and holders of the debentures in considerable amounts, were made parties defendant in their individual capacities, and also as the representatives of and in behalf of all the other numerous debenture owners.

Down to about October, 1914, the old New York, New Haven and Hartford Railroad Company, during

the period of its existence, the corporation subsequently bearing that name, the Consolidated Company and the Connecticut Company, all had offices in the same office building in New Haven, it being the main office building of the Railroad Company. The meetings of the Consolidated and Connecticut Companies were held in that building, and their books, files and records were kept therein. The directors of the subsidiary companies were all persons who were directors for the time being in the old New York, New Haven and Hartford Railroad Company, and later of the New Haven Company, and down to about October, 1914, the executive officers of the Connecticut Company and many of its departmental heads were likewise employed by and held similar positions in the New Haven Company.

Such further facts as are necessary are stated in the opinion.

The questions upon which the advice of this court is asked, as stated in the stipulation for reservation and, by reference, in the reservation, were as follows:—

"1. Whether or not the plaintiff is in any way debarred from mortgaging the main line formerly of The Fair Haven & Westville Railroad Company, in the city of New Haven, running from the corner of Whalley Avenue and Dayton Street in said city to the corner of Quinnipiac Avenue and Grand Avenue, and the power station on Grand Avenue formerly of said company, without providing in and by such mortgage for participation in the security thereon by the holders of any of the debentures of The Consolidated Railway Company described in the complaint, by reason of the clause contained in each of said debentures, to wit: 'The Consolidated Railway Company further promises that if it shall hereafter mortgage the whole or any part of the property and franchises by it owned on (here in-

sert date of debentures) except to renew existing mortgages, this debenture and the indebtedness evidenced hereby shall participate in the security of such mortgage upon equal terms with all other indebtedness or evidences of indebtedness to be secured by such mortgage.'"

"2. Whether or not upon the facts which are admitted or which are not denied in the pleadings, an equitable lien was created upon the property and franchises owned by The Consolidated Railway Company upon the respective dates of said several issues of debentures, by the issue of said debentures in the terms and under the conditions as admitted in the pleadings above referred to, in favor of those purchasing said debentures as stated and admitted in the said pleadings.

"3. Whether or not The Connecticut Company which acquired and holds the street railway properties and franchises in the manner as appears in the admitted facts in said pleadings, holds said street railway properties and franchises free and released from any obligation or lien imposed thereon in favor of the purchasers and holders of said Consolidated Railway Company debentures, and whether or not The Connecticut Company can, under the conditions and circumstances appearing in the admitted facts of the said pleadings, effect a valid mortgage upon the said properties and franchises upon terms which will preclude the said debenture holders and the defendants in this case from sharing in the security of said mortgage.

"4. Whether the obligations of the contract with the bondholders contained in said debenture bonds is protected by the Federal Constitution so that its terms are inviolable, and cannot be altered, impaired, or defeated by the subsequent special acts of the Connecticut or Massachusetts legislatures in 1915 set up in the complaint, or by a decree of a judicial tribunal."

*Walter C. Noyes* of New York City, for the plaintiff.

*Lewis Sperry* and *Harry W. Reynolds*, for the Aetna Life Insurance Company, a defendant.

*Robert C. Dickenson*, for the Travelers Insurance Company, a defendant.

*Edward G. Buckland*, for the New York, New Haven and Hartford Railroad Company, a defendant.

GAGER, J.  Upon five different dates between July 1st, 1904, and January 1st, 1906, the Consolidated Railway Company, then the owner of certain street-railway properties and franchises now owned by the plaintiff, issued its coupon debentures to a large amount, now outstanding and not yet due.  By one clause contained in them the company agreed that if it should thereafter mortgage the whole or any part of the property and franchises owned by it on a designated date, being the date which the issue bore, except to renew existing mortgages, the debentures and indebtedness evidenced thereby should participate in the security of such mortgage upon equal terms with all other indebtedness or evidences of indebtedness to be secured by such mortgage.  The plaintiff avers that the presence of this provision in the debentures and the claims of the debenture holders founded thereon, although such claims are invalid, constitute a cloud upon its title, seriously interfering with its full beneficial use of its property, and prays that this cloud be removed by an adjudication that the claims made are unfounded, and that its right to mortgage its property without the inclusion of the debentures in the indebtedness thereby secured, be judicially declared.  The issue raised by the pleadings is one of law and concerns the legal character

of the debenture provision and its effect as creating a restraint upon the plaintiff's power to mortgage its property at will.

The clause in question constituted an enforceable agreement on the part of the Consolidated Company that it would at no time mortgage its specified property save in the manner provided. When, in 1907, the long-existing New York, New Haven and Hartford Railroad Company was absorbed by and merged in the Consolidated Railway Company, and thereupon the name of the latter company was changed to the New York, New Haven and Hartford Railroad Company, the name previously borne by one of the merging companies, the legal identity of the Consolidated Company remained as before. In the strictest and most technical sense it was, after its absorption of the railroad company and its change of name, the same corporate entity that it was before. Under its newly-assumed name it continued to own the property and franchises it had owned under its former name, and as a necessary consequence remained holden by all the agreements and obligations which it had entered into or assumed under that name. This much the plaintiff does not deny.

We next find that in 1910 all of the street-railway properties and franchises of that company which had previously been successively lodged in the Consolidated and New Haven companies, are held in the name of a corporation known as the Connecticut Company, to which they had been transferred by the New Haven Company. Looking at the history of this holding company, the plaintiff, from the date of its organization in 1905 under the name of the Thomaston Tramway Company and its almost contemporaneous acquisition by the old New York, New Haven and Hartford Railroad Company, down through the five-year period of its evolution into the owner and holder of all the street-

railway franchises and property of the New Haven system, the steps taken in the accomplishment of that result, the manner in which its affairs were conducted and the character of its ownership, management and control, it is too plain to be mistaken that the transfer by the New Haven Company to the Connecticut Company, while in form a transfer from one corporate entity to another, was in substance and effect one to itself under a new guise, or at least one to its instrumentality and adjunct maintained and controlled by it for its own purposes and convenience.

It is unnecessary to follow that history in all its details. It is sufficient to note the salient facts that the Connecticut Company, from the time of its acquisition by the old New York, New Haven and Hartford Railroad Company, has continued to be owned absolutely by the latter company or its successor bearing the same name; that at all times its boards of directors have been composed entirely of men who at the same time were directors of these companies; that its executive officers have been identical with theirs or substantially so; that many of its department heads were in their employ in similar positions; and that its management and operation throughout has been that of their agency or instrumentality, acting under their immediate direction and in closest co-operation with them to advance their interests and accomplish their purposes. It has been something more than the ordinary subsidiary of the New Haven Company. It has been in the fullest sense one of its arms, completely subject to its bidding, and having no other conceivable purpose for its existence than to advance its interests by action conformable to its will and direction. The two corporations were indeed separate corporate entities and bore different names, but here the difference between them ended. In all other respects they were one. More complete

unity, whether of purpose, control, management or ultimate interest, could not be imagined than existed between them. It is only in the shadows cast by legal technicalities that a lack of unity can be discerned. Looking through these shadows to discover the substance of things, as courts are now wont to do, to the end that fraud may be defeated, obligations and responsibilities not evaded and the ends of justice subserved, only one real ownership and interest can be seen in the situation produced by the transfer in form from the New Haven Company to the Connecticut Company. *McCaskill Co.* v. *United States*, 216 U. S. 504, 515, 30 Sup. Ct. 386; *In re Watertown Paper Co.*, 94 C. C. A. 528, 532, 169 Fed. Rep. 252, 256. That real ownership was one which remained unchanged in the New Haven Company, with the result that the debenture provision in question, regarded as a mere personal undertaking, continues to forbid the plaintiff from mortgaging the designated property in violation of its terms.

But that is by no means all. If it were so, that the New Haven and Connecticut companies, by reason of their separate corporate existence, were to be regarded as independent entities as regards the transfer and technical legal rights created thereby, the release of the latter from the obligation imposed by the debenture provision would not be accomplished. From the time of the acquisition by the New York, New Haven and Hartford Railroad Company of the charter of the Connecticut Company, down through the whole period of its history, it has been developed, managed, controlled and utilized solely as an agency, instrumentality, or adjunct, of the acquiring Company and its successor, the New Haven Company, for the advancement of their purposes and the achievement of their ends as their pleasure dictated. Under such circumstances the general rule, which recognizes the individuality of cor-

porate entities and the independent character of each in respect to their corporate transactions, and the obligations incurred by each in the course of such transactions, will be disregarded, where, as here, the interests of justice and righteous dealing so demand. *In re Watertown Paper Co.,* 94 C. C. A. 528, 532, 169 Fed. Rep. 252, 256; *Baker Motor Vehicle Co.* v. *Hunter,* 152 C. C. A. 28, 33, 238 Fed. Rep. 894, 899; *Interstate Tel. Co.* v. *Baltimore & O. Tel. Co.,* 51 Fed. Rep. 49, 52; *Southern Pacific Terminal Co.* v. *Interstate Commerce Com.,* 219 U. S. 498, 521, 31 Sup. Ct. 279.

The next property change of possible present interest occurred in 1913 when the New Haven Company transferred the 400,000 shares of the capital stock of the Connecticut Company, then in its treasury, to the New England Navigation Company, another of its controlled subsidiary agencies, in exchange for a block of its stock which had theretofore been transferred to the Navigation Company by the New Haven Company in furtherance of the latter's projects and purposes. It is not claimed that this transaction or the situation created thereby has any practical bearing upon the present controversy, and clearly it does not.

The final matter of possible present importance as bearing upon the debenture holders' position and rights, is the court decree of October, 1914. It, however, accomplished no change in the ownership of the property standing in the name of the Connecticut Company. As a result of it the trustees took title to that Company's capital stock only. The title to the Company's property remained where it was before the decree was entered. The trustees' stock-holding was simply that of trustees for the Connecticut Company and through it for the New Haven Company, the ultimate party in interest, and the dominion they exercised over the property, whether by virtue of their position as stockholders cr

by force of the terms of the decree, was one exercised in that capacity and for the benefit of the New Haven Company, its real owner, and at that Company's charge and expense should a balance of expenditures over receipts result from the execution of the powers and performance of the duties conferred and imposed upon them. Here was a distinct recognition of the true status of the ownership of the property entrusted to the trustees' care, and clearly no change was made in that ownership.

The inevitable result of this review of the pertinent or possibly pertinent facts, which the record discloses as having marked the history of the Consolidated Company and its property since the debentures were issued by it, is to establish that nothing has taken place to relieve the plaintiff from the obligation imposed by the debenture provision in question, and to render it free to disregard that provision, even if it be reduced to its lowest terms and regarded as a purely personal agreement.

The situation presented by the multiplicity of details contained in the record, and the rapidly succeeding changes in property ownership disclosed therein, would have been made easier of comprehension and analysis had the Consolidated Company continued under its former name subsequent to its absorption of the old New York, New Haven and Hartford Railroad Company, and had not assumed the name borne by that corporation. It would then have stood out more clearly than it now does, that only two corporate entities have been concerned in the more important transactions of record, to wit, the Consolidated Company, the debenture-maker and the real owner of the property from the time of their issue to the present, and the Connecticut Company, raised up by the Consolidated Company to act as its *alter ego,* and absolutely controlled and

utilized by it to execute its behests in the advancement of its purposes at its will and pleasure. Such being the situation, the conclusion above stated is the only one consonant with either legal principles or right dealing.

Having answered a fundamental question in the case, we proceed to discuss the second question raised by the reservation, which is, in substance, whether or not the covenant in question created an equitable lien or an equitable charge in the nature of a lien.

The plaintiff contends that at the most the clause in the debentures under discussion constitutes a negative covenant only, and that no lien will lie to enforce a negative covenant. It says: "The Consolidated Company did not agree to give any mortgage. It promised only that it would not secure other creditors by a mortgage without giving debenture holders an equal benefit in the security." And it is further said that the present intention does not appear; that the provision is conditional, contingent, and deals with the future, and so no lien can be raised.

The language of the covenant is this: "The Consolidated Railway Company further promises that if it shall hereafter mortgage the whole or any part of the property and franchises by it owned on . . . [date of debenture], except to renew existing mortgages, this debenture and the indebtedness evidenced hereby shall participate in the security of such mortgage upon equal terms with all other indebtedness or evidences of indebtedness, to be secured by such mortgage." The language is precise, is limited in its final application to a future mortgage, and is an affirmative, positive covenant of security. While not an absolute agreement to give a mortgage, it is an absolute agreement that if and when a mortgage is given, these debentures shall be brought under the wing of its security.

The negative interpretation arises by implication and is but that sort of a negative which is a necessary correlative to any affirmative undertaking, that is, that the Company will not break its agreement. That the agreement is contingent upon the giving of a mortgage for its final effectiveness, in no way affects its positive affirmative character. By force of this covenant, the giving of a mortgage in equity automatically draws these debentures within its protection and consummates the undertaking of the covenant; but all the time, from the issue of the debentures to the issue of a mortgage, if such there should be, the property described in the debentures lies with this obligation resting upon it, imposed by the affirmative agreement of the owner. It is idle to say that the covenant was not phrased with the intention of implying a real security. While subsequently incurred indebtedness could be secured by a mortgage, it could be only on an equality with these debentures. There is a clear distinction between the personal contract not to mortgage, and the covenant that any mortgage given on definite property should include these debentures. The covenant is a present engagement not only to hold specified property free of any priority, but to give equality of security by bringing the debentures under any mortgage that might be given. That the actual creation of the mortgage is contingent, does not affect the existence of a lien created by the declared intention of holding property for the benefit of the debenture holders to respond to the undertaking, definitely, though contingently, imposed upon it. *Storm* v. *Waddell,* 2 Sandford's Ch. (N. Y.) 494. This covenant creates from the start an inchoate right, but none the less real and beneficial, and only beneficially enforceable by considering it as a charge upon the property described, to the limited extent and within the limited scope of the covenant, a

charge which the Company and all others bound by the equities are bound to recognize as such, quite apart from the personal obligation which, of course, is not affected by the fact that the obligation raises an additional right other than personal in its character. The content of the lien, if it may be so expressed, is limited by the terms of the covenant; but to the full extent of that content the intent to charge the property with the performance of the obligation is apparent, or else the covenant is a mere blind calculated to create expectations and confidences which the maker has no intention of carrying out. This right is a lien within the approved definition. To go no further than Bouvier's Dictionary, it is "A hold or a claim which one person has upon the property of another as a security for some debt or charge." It is "a qualified right which in certain cases may be exercised over the property of another." A lien may exist not only directly for the payment of money enforceable by appropriate equitable process, which indeed is the ordinary case, but such a lien may exist to secure the performance of an obligation where the obligation is in itself connected with and tied up to specific property, and is manifestly intended to be made binding on that property and is in the nature of security, although the liquidation of the security may be long delayed.

In the present case the qualified created right is not to an immediate appropriation of the property to the payment of the debentures, for they will not become due for many years—in the 1950's it appears; nor is the right one immediately to compel a legal mortgage, for this cannot, by the terms of the agreement, be done until the company undertakes to give a mortgage. But the term "lien" is not limited to rights of this sort. We may cite the words of Mr. Justice Erle, to which reference was made on argument: "The words, 'equitable

lien' are intensively undefined." *Brunsdon* v. *Allard,* 2 Ell. & Ell. 19, 27. In 1 Jones on Liens (3d Ed.) § 28, it is said: "In courts of equity the term 'lien' is used as synonomous with a charge or incumbrance upon a thing, where there is neither *jus in. re,* nor *ad rem,* nor possession of the thing. The term is applied as well to charges arising by express engagement of the owner of the property, and to a duty or intention implied on his part to make the property answerable for a specific debt or engagement." After citing Mr. Justice Erle, *supra,* the text goes on: "It is necessarily the case that something of vagueness and uncertainty should attend a doctrine that is of such a wide and varied application as is this of equitable lien. And yet the principles are as well defined as other equitable principles, and their application to certain well-established classes of liens is well settled. To apply them to that undefined class of liens which arises from the contracts of parties may be more difficult, because these liens are as various as are the contracts, and precedents which exactly apply may not be found. This wide application of the doctrine is one element of the importance of this branch of equity jurisprudence."

The cases and the text-writers amply bear out the statement made by Mr. Jones, that these liens are as various as are the contracts of parties, and that precedents which exactly apply may not be found; and it is not the duty of a court of equity, in passing upon a given case, to limit and restrain itself in accordance with the facts of the more frequent and unquestioned classes of liens which arise and are enforceable directly for the payment of money, but the court must take into account the whole contract and the manifest intention of the parties, and determine whether or not the language under the circumstances used is reasonably and fairly to be construed as a stipulation that the specific property

described in the contract shall be held and bound in the manner and for the purposes stated in the contract. As bearing upon this view we cite further from Pomeroy's Equity Jurisp. (3d Ed.) § 1234, in which he discusses the origin and rationale of the doctrine with reference to the nature of the remedies of equity which are as a class specific, and then goes on: "When equity has jurisdiction to enforce rights and obligations growing out of an executory contract, this equitable theory of remedies cannot be carried out, unless the notion is admitted that the contract creates some right or interest in or over specific property, which the decree of the court can lay hold of, and by means of which the equitable relief can be made efficient. The doctrine of 'equitable liens' supplies this necessary element; and it was introduced for the sole purpose of furnishing a ground for the specific remedies which equity confers, operating upon particular identified property, instead of the general pecuniary recoveries granted by courts of law. It follows, therefore, that in a large class of executory contracts, express and implied, which the law regards as creating no property right, nor interest analogous to property, but only a mere personal right and obligation, equity recognizes, *in addition to the personal obligation,* a peculiar right over the thing concerning which the contract deals, which it calls a 'lien' and which, though not property, is analogous to property, and by means of which the plaintiff is enabled to follow the identical thing, and to enforce the defendant's obligation by a remedy which operates directly upon that thing." In § 1235 the same author says: "In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an

intent that the property so described or rendered capable of identification, is to be held, given, or transferred as security for the obligation."

In the present case it appears the particular property is so described that it can be identified, for it is the property owned by the obligor at the date of the bond. We think it also clear that the covenant shows that the property so described is to be held by the obligor as security for the obligation in the covenant undertaken. See cases cited to the note to § 1235, Pomeroy. Further, at the end of § 1237, he says, referring to various instances cited by him: "They show that the form is immaterial, if the intent appears to make any identified property a security for the fulfillment of an obligation."

In the comparatively recent case of *Westall* v. *Wood*, 212 Mass. 540, 544, 99 N. E. 325, the court, speaking by Rugg, C. J., says, with reference to equitable liens: "But an equitable lien does not of necessity rest exclusively upon an express agreement. It may arise from circumstances of such nature as to require the presumption, upon general considerations of justice as between those conducting commercial transactions according to a reasonable standard of integrity that an equitable lien was meant. Equity looks at the substance, and not at the form. If the arrangement between the parties, interpreted in the light of the conditions in which they were placed, indicates a contemporaneous intention to adjust their rights upon a basis which can be established only by resort to the equitable principle of lien or pledge, then, in the absence of an intervening adversary interest, such an intent will be executed in chancery." In the much quoted case of *Walker* v. *Brown*, 165 U. S. 654, 666, 17 Sup. Ct. 453, 41 L. Ed. 871, it is said: "To dedicate property to a particular purpose, to provide that a

specified creditor and that creditor alone shall be author-
ized to seek payment of his debt from the property or
its value, is unmistakably to create an equitable lien."
And again(p. 668), citing *Runkle* v. *Burnham*, 153 U. S.
216, 224, 14 Sup. Ct. 837, 38 L. Ed. 697: "If there be
ambiguity in the contract resort may be had to the sit-
uation of the parties and the circumstances under which
it was entered into for the purpose, not of changing the
writing, but of furnishing light by which to ascertain
its actual significance."   The oft-quoted language of
Judge Story in *Flagg* v. *Mann*, 2 Sumner (U. S.) 486,
Fed. Cases No. 4,847, is not without significance: "If
a transaction resolve itself into a security, whatever
may be its form [and whatever name the parties may
choose to give it] it is in equity a mortgage [lien]."
Note to Pomeroy's Equity Jurisp. § 1237.

Perhaps the operation of the covenant under con-
sideration may be illustrated by the somewhat analo-
gous principle involved in the well-recognized equi-
table rule in case of a sale or mortgage of property to be
acquired in the future.   In § 1236, Pomeroy says: "It
is well settled that an agreement to charge, or to as-
sign, or to give security upon, or to affect property not
yet in existence, or in the ownership of the party mak-
ing the contract, or property to be acquired by him in
the future, although, with the exception of one partic-
ular species of things [those having a potential ex-
istence], it creates no legal estate or interest in the thing
when they afterwards come into existence or are ac-
quired by the promissor, does constitute an equitable
lien upon the property so existing or acquired at a sub-
sequent time, which is enforced in the same manner and
against the same parties as a lien upon specific things
existing and owned by the contracting parties at the
date of the contract."   Pomeroy cites the celebrated
case of *Holroyd* v. *Marshall*, 10 H. L. Cas. 191, and many

others. To these may be added *Tailby* v. *Official Receiver*, L. R. 13 App. Cas. 523. The same doctrine is applied with respect to the creation of an equitable title by the assignment of property to be acquired in the future. Pomeroy's Equity Jurisp. § 1288. The rationale of the doctrine is in this same section explained as follows: "In truth, although a sale or mortgage of property to be acquired in the future does not operate as an immediate alienation at law, it operates as an equitable assignment of the *present possibility*, which changes into an assignment of the *equitable ownership* as soon as the property is acquired by the vendor or mortgagor." The recent English case of *In re Lind*, L. R. (1915) 2 Ch. Div. 345, illustrates the principle. In 1905 L, who was one of the next of kin of his mother, was presumptively entitled to a share of her personal estate, and assigned his expectant share to the N. society by way of mortgage. In May, 1908, he assigned the same share to A by way of mortgage, subject to the mortgage of 1905. In August, 1908, he was adjudicated a bankrupt, and in 1910 received his discharge. In 1911 L assigned his expectant share to the I. syndicate. In 1914 L's mother died; and the question was whether under these circumstances his mortgages imposed merely a personal liability affected by his discharge in bankruptcy, or whether the mortgages operated as a transfer of his share upon the death of his mother so that his two mortgagees were entitled to priority over the I. syndicate. The court held that the contract was more than a personal contract; that it created an equitable interest in the property, and that the mortgagees were entitled to priority. A number of the judges gave opinions, and we quote from the opinion of Swinfen Eady, L. J., page 360, where, after reviewing the authorities, he says: "It is clear from these authorities that an assignment for value of future prop-

erty actually binds the property itself directly it is ac-
quired—automatically on the happening of the event,
and without any further act on the part of the as-
signor—and does not merely rest in, and amount to, a
right in contract, giving rise to an action.   The as-
signor, having received the consideration, becomes in
equity, on the happening of the event, trustee for the
assignee of the property devolving upon or acquired
by him, and which he had previously sold and been paid
for."   The acquisition of the property in fact was a
contingency, but this did not make the obligation a
mere personal contract.

In the present case the contingency is not one of ac-
quiring the property, but of the giving of a mortgage.
The application of the principle appears to be substan-
tially the same.   When the mortgage is given, automat-
ically, in equity, the described property comes under
it.   No omission of the mortgagor, no attempt by it to
limit the security to the later debts, will avail to shut
out the debenture holders from sharing, in equity, in
the security of the mortgage, whether their debentures
are named in it or not, whether the mortgagor attempted
to exclude them or not.

The plaintiff cites *Western National Bank* v. *National
Union Bank,* 91 Md. 613, 46 Atl. 960.   In that case
a wife signed a note as maker with her husband and
added to her signature the words: "For the payment of
which I bind my separate estate."   That was a case
where the rights of third parties as between themselves
were involved, and the court held that the words did
not, as against the rights of an attaching creditor,
create an equitable mortgage.   The case was somewhat
affected by the statute concerning married women, but
the court did say that if no rights of third parties were
involved it would adopt the ruling in *Hall* v. *Eccleston,*
37 Md. 510, and hold that so far as the wife was con-

cerned such an agreement would constitute, as between the parties, an equitable lien to be enforced in equity as being somewhat in the nature of an equitable mortgage. The plaintiff next cites *Mathews* v. *Damainville*, 100 N. Y. App. Div. 312, 91 N. Y. Supp. 524. It appears that Mrs. Romeyn owed Mathews, Grange & Company $2,000, evidenced by a bond dated March 20th, 1899. The bond also recited that foreclosure proceedings were pending against the obligor, and she bound herself to pay the $2,000 out of the balance left to her after conclusion of the foreclosure. She further agreed that if the foreclosure proceedings should, for any reason, be set aside or discontinued, she would, upon demand, execute a proper bond and mortgage to secure the said Mathews, Grange & Company the payment, within six months, of such amount as should at that date be due them. The instrument was recorded April 4th, 1899; the foreclosure proceedings were discontinued April 21st, 1899. The bond was not paid and Mrs. Romeyn conveyed the land to a third person and the title subsequently came to the defendant; and the case turned on the question of notice by the record of the obligation arising under the contract with reference to a bond and mortgage. Three out of the five judges held that the instrument having been recorded before the discontinuance of the foreclosure suit, it was not, when the record was made, notice under the Recording Act, because the contract was an executory contract to give a mortgage, and at the time of the record there was not an equitable mortgage or lien and no action could have been brought to enforce it. The Recording Act provided for the registry of any written instrument by which any estate or interest in real property is created, transferred, mortgaged or assigned, or by which the title of any real estate may be affected. Two judges

held otherwise, and that the instrument was an equitable mortgage and the record, though made prior to the discontinuance of the foreclosure suit, was notice. The further question of actual notice was involved, but that part of the case is not material here. The majority admits that had the record of this same instrument been made after the foreclosure had been discontinued, the question would have been different. The case, then, turned on the technical question of notice by the record, and the court appears to hold that there must be in existence a present right of foreclosure of the equitable lien created by the instrument, at the time of the record. This, we think, is too technical and narrow a view of what is meant by an equitable lien. The opinion of the minority appears preferable.

The same matter was before the court in *People ex rel. Mathews* v. *Woodruff*, 75 N. Y. App. Div. 90, 77 N. Y. Supp. 722, where it was unanimously held that an equitable lien was created by the instrument itself, without any demand from the obligor after foreclosure proceedings were discontinued. The court, in discussing this proposition, said that there was a distinct and positive agreement to execute a mortgage to secure the $2,000, conditioned upon the discontinuance of the foreclosure, and that the intent was plain; that she first intended to pay out of the surplus money upon the foreclosure, but if she could not do that she agreed to give a lien by mortgage upon the land itself, and that the demand was not a condition precedent to any liability on Mrs. Romeyn's part under the agreement; that her obligation arose at once, and that there was nothing in the claim made that it did not accrue until the mortgage was demanded. In other words, the equitable lien as a consummated fact arose *ex proprio vigore* from the contract itself whenever the contingency provided for happened. We are unable to under-

stand how a record made before discontinuance could in and of itself become notice of what occurred after discontinuance, except upon the theory of a contingent lien from the giving of the instrument. There is all the time an agreement to give a lien, and in equity this is binding upon the parties and in full force as between them as affecting and binding the land for the purposes of the agreement. That the final step in the creation of an enforceable mortgage as such depended upon a contingency, does not, as we have seen heretofore, affect the nature of the agreement. But, whatever conclusion may be reached upon the whole record of this case, it is not of sufficient authority to be decisive upon the point at issue.

Next, the plaintiff cites the old case of *Williams* v. *Lucas*, 2 Cox Ch. 160. We do not see the relevancy of this case, unless upon the point of identification of property, and that seems to be met by the terms of the covenant we are considering. In the case cited the testator had given a note and promised to give security by mortgage of lands when required. What the court said was: "That the creditor had taken a personal security, reserving to himself the power of calling for a real security, which however he had not done, and therefore it was impossible to say that this debt was a charge on any particular lands." The covenant now under consideration does not operate as creating a power in the obligee to bring into existence a lien or mortgage by demand. That right is independent of any demand. The covenant does contain an absolute, though contingent, obligation on the part of the obligor to perform the duty imposed by the contract. *Williams* v. *Lucas* was based upon *Freemoult* v. *Dedire*, 1 P. Williams, 429, which holds that the covenant to settle lands of certain value, without mentioning any land, does not specifically bind any lands, but the covenant to settle his lands

in Rumney Marsh for life constituted a specific lien. Accordingly, both these cases are cited in the books on the question of identification, or specific designation of property. Pomeroy's Equity Jurisp. § 1235, note 3; Story, Equity, § 1657, note 2; Spence, Equity, 777, note (d).

There is one further element in the present case worthy of notice. *Dresser* v. *Hartford Life Ins. Co.*, 80 Conn. 681, 70 Atl. 39, involved the construction of a life insurance contract, and the question arose as to the admissibility of circulars and statements of the company placing a construction on the contract. The court said, on page 703, omitting citations: "It would be at least a constructive fraud for the insurance company, under an interpretation by it of the language of the certificates in direct variance with the representation of these circulars, to use the moneys of the 'safety fund' department to the injury of the plaintiffs. . . . The alleged written statements of the company would be admissible in evidence as showing, in connection with proof that the plaintiffs relied upon them, the interpretation which the parties themselves placed upon the contract of insurance. They tend to prove that when the plaintiffs received these certificates, and paid from time to time the sums required to be paid by the certificates, both they and the insurance company understood the contract alike." From this point of view we think great weight is to be attached to the statements of Mr. Mellen in 1905 before the legislative committee, when urging that these debentures be made a legal investment for Connecticut savings-banks. Mr. Mellen was president, not merely in title, but the actual head and director of the policies of the New Haven road and its corporate agencies, including the Consolidated Railway Company. He was urging the adoption of a law of vital importance to savings-banks and trustees,

and his words were intended to be taken, and must in fact have been taken, as uttered honestly and under a sense of responsibility, not only to the legislative committee, which he was immediately addressing, but to all of those whose interests might be affected by the doings of this committee. His words are not to be regarded as "loose statements," "informal statements," as urged by counsel, who see clearly their force if taken seriously. Omitting certain parts of his admitted statement as explanatory of what he was saying, the language he used pertinent to these debentures, in view of the present question of the creation or non-creation of a lien, is as follows: "This gives the New York, New Haven and Hartford Railroad Company an investment of ten million dollars in the Consolidated Railway Company, to which the Consolidated Railway Company debentures are a prior lien. The New Haven road must protect these bonds so as not to sacrifice their own investment, which makes the bonds a moral obligation, though not a legal one, of the New Haven and Hartford Railroad Company. They are also practically a first mortgage on the Fair Haven and Westville system, as well as on a few of the unmortgaged roads. . . . The main object of the petition to make the bonds legal for Connecticut savings-banks, . . . is to broaden the market, and thus enhance the value of the bonds, as well as to have as little difference in the values of the Consoldated Railway Company and the New York, New Haven and Hartford Railroad Company bonds [as possible]." Mr. Mellen had stated that the New York, New Haven and Hartford Railroad Company owned the entire ten million dollars Consolidated Railway Company stock, and it is therefore argued that of course these debentures must be taken care of to protect the investment of the ten million dollars in the Consolidated Railway Company. While that is

quite true, it does not justify the characterizing of these debentures as a prior lien, unless the intention was to convey the idea that they were in fact a prior lien, with the substantial attributes of a lien. There can be no possible misunderstanding of the inference conveyed and intended to be conveyed by these words, that these bonds were in effect a lien or mortgage. And this idea is clinched by saying that they were "practically a first mortgage on the Fair Haven and Westville system," which latter, by the way, is the specific property the plaintiff expressly asks to be declared free of any lien. It is not necessary here to draw any fine distinction between lien and mortgage, although there is a substantial difference, as we have heretofore indicated. The basic idea conveyed by Mr. Mellen was that the properties were specifically charged with the obligation of these debentures. His object, as stated by him, was to enhance the value of the bonds and to make their value as nearly as possible that of the New York, New Haven and Hartford Railroad Company bonds outstanding. At that time, in 1905, to say a debenture was as good as a bond of the New Haven road meant something, and Mr. Mellen, as president of that road and of the Consolidated Railway Company, clearly carried the idea that the debentures of the Consolidated Railway Company, because in fact they constituted a lien on the properties of the company and were practically a first mortgage of the Fair Haven and Westville system and a few unmortgaged roads, were as good a security as the New Haven road bonds. If so, confessedly it could only be because they had the properties of the Consolidated Railway Company back of them and tied to them by the terms of the debentures. Mr. Mellen, for the Consolidated Railway Company, succeeded in his proposition, and by Chapters 184 and 207 of the Public Acts of 1905, all bonds

of the Consolidated Railway Company were made a legal savings-bank investment.

It further appears, and is admitted, that in connection with each of the four issues of these debentures of the Consolidated Railway Company, charts were prepared and filed, and are now on file in the office of the Public Utilities Commission, bearing the dates, respectively, of the issues of the different series of debentures, and indorsed: "Chart showing relative portions of street railway system owned by the Consolidated Railway Company. . . [date here inserted] and covered by the equitable lien of its debentures of that date." While Mr. Mellen's statements and these charts, of course do not make the contract, they are definite and forcible expositions of what the company, at the time the debentures were issued, believed the contract to mean, and at any rate are what it wished the savings-banks and other investors should believe that it meant.

Attention is called to § 7 of a Special Act of the General Assembly of Connecticut, approved May 19th, 1915, amending the charter of the New York, New Haven and Hartford Railroad Company, providing, among other things, as follows: "Any mortgage executed by said company shall secure, on equal terms with any other indebtedness secured by such mortgage, all bonds, debentures, and notes previously issued and at such time outstanding of which said company is the maker or which it has assumed through merger or consolidation with the original and principal obligor, except outstanding bonds, debentures, or notes while and so long as the same are, in accordance with any promise contained therein, secured by another direct mortgage." It appears that the New Haven Company succeeded to, and became bound by, and assumed, the obligations contained in said debenture bonds. The fact that the New Haven road as constituted in 1915

has assumed these debentures, and that, by its charter, it has now imposed upon it the mortgage obligation stated in said amendment, cannot affect or control the Consolidated Railway Company or its successor, the Connecticut Company. The obligation of the latter companies is a contract obligation anticipating by ten years the obligation placed by the Legislature upon the New Haven road, presumably as just and equitable, in 1915. The amendment may be of benefit to the debenture holders, but it does not operate to discharge or modify the contract obligations of the Consolidated Railway Company, and this action is not concerned with the properties of the New Haven road, but the properties described in the debentures of the Consolidated Railway Company. The same may be said of the general Act of the Massachusetts Assembly to the same effect and passed in the same year, 1915.

In conclusion, counsel for the plaintiff company says in his brief: "All that the debenture holders had the right to insist upon was that their position as unsecured creditors should not be put at hazard by a mortgage in which they would have no interest." And yet, in view of this concession, that company, by its prayer for relief, is now asking and arguing that it be determined that it now has the power to mortgage these properties "without providing, in and by such mortgage, for participation in the security thereof by any holder of any of said debentures." All that we hold, and what we do hold, is that the covenant securing this right is binding as a personal contract, and that, as between the parties, it is in equity binding upon the property as a charge or incumbrance in the nature of a lien, enforceable as such to the extent of fully protecting and making available this right conceded to exist in the debenture holders as an equitable charge good between the parties and binding upon any mort-

gagees taking with such notice as binds one to the recognition of existing equities with respect to specific property.

Although it ought to be needless, we cannot refrain from commenting upon the fact that counsel for the plaintiff company has, at length, both at the beginning and end of his brief, seriously urged the financial necessities of the company. To have the question of power definitely settled is a sufficient reason for bringing the action, and we construe this enlargement on the admitted necessities of the company, as being merely explanatory of why the action was brought. The construction of contracts is not to be controlled by the subsequent misfortunes, however inevitable or unescapable they may have been, of the contracting party. The covenant in question was given for the very purpose of protecting the debenture holders, in some measure at least, against such conceivable, although then hardly deemed possible, situation as now exists.

The Superior Court is advised to answer questions one, two and four in the affimative, and question three in the negative.

In this opinion RORABACK and WHEELER, Js., concurred. PRENTICE, C. J., and BEACH, J., concurred in so far as the opinion concerns the answers to be returned to questions one, three and four, but dissented from the conclusion that question two be answered in the affirmative.