Joel McPHERON, Plaintiff,

v.

**PENN CENTRAL TRANSPORTA-
TION CO. et al., Defendants.**

Civ. A. Nos. B–313, B–689.

United States District Court,
D. Connecticut.

Feb. 24, 1975.

Zeldes, Needle & Cooper, Bridgeport, Conn., for plaintiff; Robert S. Cooper, Bridgeport, Conn., of counsel.

Wiggin & Dana, New Haven, Conn., for defendant Penn Central Co.; Shaun S. Sullivan, New Haven, Conn., of counsel.

LEVET, Senior District Judge.*

The original action in the above-entitled case was filed by plaintiff in the District of Connecticut on June 16, 1971, file No. B–313. On April 7, 1972, plaintiff instituted an action against the same named defendants in the Eastern District of Pennsylvania, file No. 72–697. Later, pursuant to a motion by defendant Penn Central Transportation Co., the Pennsylvania action was transferred to the District of Connecticut, file No. B–689, by order of United States District Judge John Morgan Davis of the Eastern District of Pennsylvania. The issues in both of these cases are identical.

Defendant Penn Central Transportation Co. (hereinafter referred to as the "transportation company") is the railroad operating company. Defendant Penn Central Co. (hereinafter referred to as the "holding company") is the parent holding company of the transportation company.

Plaintiff claims to have been injured on April 23, 1970 at Fairfield, Connecticut when he fell from a train operated by defendant Penn Central Transportation Co. while a passenger on a train eastbound from Grand Central Station, New York.

As pleaded in the Connecticut action, plaintiff is a citizen of the State of Connecticut and the complaint alleges that defendants Penn Central Transportation Co. and Penn Central Co. are Pennsylvania corporations with their principal place of business in Philadelphia, Pennsylvania. Allegedly the amount in controversy exceeds $10,000, exclusive of interest and costs. Thus, if the court has personal jurisdiction over defendants it would be a proper diversity case.

Certain motions were made in the Federal District Court of Connecticut, as follows:

(1) Defendant Penn Central Co. moved to dismiss the action against it on the ground of lack of jurisdiction.

---

* Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

This motion, made before United States Magistrate Arthur H. Latimore on July 16, 1971, was denied on June 16, 1972. The magistrate found the record before him insufficient to warrant dismissal. The magistrate's reluctance to dismiss the action at that time was based on the fact that the foreign corporation was a holding company and on the record before it the court could "infer no significant purpose in the parent company's organization other than that of holding and controlling the subsidiary operating company's stock." (Memorandum Decision, June 16, 1972, p. 5.)

(2) Subsequently, defendant Penn Central Co. made a motion to reargue the foregoing motion. In a memorandum order of October 5, 1972 denying this motion to reargue, Magistrate Latimore stated that defendant sought reargument of the foregoing motion for the purpose of amplifying the record by introducing certain testimony by its president. In the magistrate's opinion he said:

" * * * The Court's initial denial of the motion to dismiss of course neither relieves plaintiff of the burden of establishing jurisdictional facts by a preponderance of the evidence at trial, see United States v. Montreal Trust Co., 358 F.2d 239, n. 4 at 242 (2 Cir.) cert. denied, 384 U.S. 919 [86 S.Ct. 1866, 16 L.Ed.2d 440] (1966), nor forecloses pretrial reconsideration upon a more fully developed record, cf. ACS Industries, Inc. v. Keller Industries, Inc., supra, [296 F.Supp. 1160] at 1163. It is hardly a sound course of judicial administration, however, to permit piecemeal development of the record under the *aegis* of repeated applications for rehearing. * * *·" (Memorandum Decision, October 5, 1972, p. 2.)

However, Magistrate Latimore further wrote on page 3 of his said opinion:

" * * * Renewal of the motion to dismiss may be warranted upon prompt completion of a pertinent record of discovery undertaken in an orderly fashion; rehearing at this juncture and in the manner currently suggested is inappropriate." (Memorandum Decision of October 5, 1972, p. 3.)

Thereafter, defendant holding company moved for a separate trial on two issues: (1) Whether *in personam* jurisdiction exists over the defendant holding company, and (2) whether the holding company is liable for the torts of its subsidiary, the transportation company. This motion was granted by Judge Newman on April 30, 1974 and forms the basis for the present proceedings. (Ruling on Motion for Separate Trial, April 30, 1974.)

At a pretrial conference before District Judge Richard H. Levet in Bridgeport, Connecticut on November 15, 1974 the parties stipulated to a submission of the two aforementioned issues to Judge Levet for determination based upon a stipulation of facts. All parties agreed that "it is the position of the parties the [two] preliminary questions, which will be briefed by counsel immediately will control in both of said cases." (Stipulation in chambers, November 15, 1974.) On November 22, 1974, pursuant to a motion by counsel for defendant Penn Central Co., the aforementioned stipulation of November 15, 1974 was modified to provide: "In the event the court rules in plaintiff's favor on the disputed jurisdictional allegations in McPheron v. Penn Central, et al (District of Connecticut Civil No. B–313), which allegations have been severed by the Court pursuant to Rule 42 of the Federal Rules of Civil Procedure for an early trial, any ruling thereafter by the Court in that action on the question of whether the Penn Central Company may be held liable for the alleged tortious conduct of the Penn Central Transportation Company, another preliminary issue which has been severed by the Court for early trial in McPheron v. Penn Central, et al (Civil No. B–313), shall be controlling in the companion case of McPheron v. Penn Central, et al (Eastern District of Pennsylvania Civil No. 72–697)." (Motion for Modification, November 22, 1974.)

It should be noted that a determination that this court has jurisdiction over the defendant holding company is not a determination of the liability issue. Such a determination merely would permit consideration of whether or not the holding company may be held liable for the negligence of its subsidiary, the transportation company. Of course, a determination that this court lacks jurisdiction over the defendant holding company necessarily precludes any further consideration by this court of liability of the holding company.

On November 22, 1974, pursuant to the stipulation of November 15, 1974, the parties submitted a Stipulation of Facts. (See Stipulation of Facts, attached hereto.)

## FACTS

The facts, based on the stipulation, in respect to the corporate backgrounds here are substantially as follows:

(1) The Pennsylvania Railroad Co. was organized as a railroad operating company in 1846 pursuant to a special act of the Pennsylvania legislature. (Stipulation, ¶7.)

(2) The Penn Central Co. is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. (Stipulation, ¶2.)

(3) The Penn Central Transportation Co. is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. (Stipulation, ¶3.)

(4) The train on which plaintiff claims to have been injured was operated by Penn Central Transportation Co. (Stipulation, ¶5.)

(5) On February 1, 1968 the New York Central Railroad Co. merged into the Pennsylvania Railroad Co. The name of the resulting merged railroad was changed to Penn Central Co. on May 1, 1968. (Stipulation, ¶9.)

(6) On January 1, 1969 the New York, New Haven & Hartford Railroad Co., on which section the alleged accident took place, was included in the railroad system of the Penn Central Co. (Stipulation, ¶10.)

(7) In January 1969 the Board of Directors of the Penn Central Co., above mentioned, approved the creation of a new corporation, a holding company, whose shares would be publicly held, which, in turn, would own all of the outstanding stock of the railroad operating company, Penn Central Co., as the railroad operating company was then known. (Stipulation, ¶11.)

(8) Thereafter, on February 26, 1969, the Board of Directors of the Penn Central Co. approved steps creating a holding company. (Stipulation, ¶12.)

(9) Pursuant to the Plan of Merger and Reorganization the Penn Central Holding Co. was organized on April 1, 1969 under the laws of Pennsylvania. (Stipulation, ¶13.)

(10) On May 13, 1969 at the Annual Meeting of the Penn Central Co. the stockholders approved the Plan of Merger and Reorganization and the Articles of Incorporation of the holding company. (Stipulation, ¶14.)

(11) The Plan of Merger and Reorganization became effective on October 1, 1969 at which time the name of the holding company was changed from the Penn Central Holding Company to Penn Central Co., and the name of the railroad operating company was changed from Penn Central Co. to Penn Central Transportation Co. (Stipulation, ¶15.)

(12) At the present time the Penn Central Co. is the holding company created under the Plan of Merger and Reorganization and was formerly known as the Penn Central Holding Co. (Stipulation, ¶16.)

(13) The Penn Central Transportation Co., also named as a defendant herein, is a railroad operating company formerly known as Penn Central Co. (Stipulation, ¶17.)

(14) Following the creation of this holding company, all of the assets, equipment, rolling stock, physical plant and right of way, including buildings,

railroad stations, signals and improvements thereon previously owned by the transportation company remained the property of the transportation company. (Stipulation, ¶18).

(15) The business purposes stated for the incorporation of the holding company, as expressed in the proxy materials and the transcript of the May 13, 1969 annual meeting, and the report thereof, were to facilitate a program of diversification designed to encourage growth and financial stability. The following specifically appear in the 1969 proxy materials, the transcript of the May 13, 1969 Annual Meeting and the Report of the Annual Meeting:

a. It was anticipated that the creation of the holding company would result in a strengthened financial position, permitting both growth and stability of earnings.

b. It was anticipated that the creation of the holding company would facilitate an aggressive and sound program of acquisition.

c. It was anticipated that such acquisitions would require the issue of additional securities and that the creation of the holding company would permit less complicated, costly, and time-consuming procedures in that regard, since the issuance and sale of securities by the holding company would be regulated by the Securities and Exchange Commission rather than the Interstate Commerce Commission.

d. It was anticipated that the securities issued by the holding company would be more attractive to the investing public and would more accurately reflect the broader scope and diversified nature of the program to be undertaken.

e. It was anticipated that the creation of the holding company would provide significantly greater flexibility in arranging and managing financing.

f. It was anticipated that the existence of the holding company would facilitate a program of corporate simplification, in accordance with an outstanding order from the Interstate Commerce Commission.

g. It was anticipated that the holding company would engage in an active program of acquisition and diversification in order to develop multiple sources of income and variety of growth and income-producing investments.
(Stipulation, ¶19.)

(16) In February 1970 the holding company acquired Southwestern Oil and Refining Company, a Texas corporation, and the Royal Petroleum Corporation, a New York corporation, and it appeared that at that time the combined annual gross revenues of the two said companies were 90 million dollars. (Stipulation, ¶20.)

(17) Subsequent to October 1, 1969 the holding company organized Penn Central International, N.V., a wholly-owned subsidiary organized to arrange financing from foreign sources. (Stipulation, ¶22.)

(18) On April 23, 1970 the affairs of the holding company were controlled and managed by its ten executive officers and its fourteen directors. The office of each of these executive officers was located in Philadelphia and each of these officers occupied a similar position with the transportation company. The transportation company had thirty-nine executive officers located in its main office at Six Penn Center Plaza, Philadelphia, Pennsylvania and in its regional offices. Each of the fourteen directors of the holding company was also a member of the transportation company's twenty-one man Board of Directors. (Stipulation, ¶24.)

(19) On April 23, 1970 the holding company owned all of the outstanding stock of the transportation company, Penn Central International. N. V., Southwestern and Royal. (Stipulation, ¶23.)

(20) On April 23, 1970 the holding company and the transportation company occupied the same offices at Six Penn Center Plaza, Philadelphia, Pennslyvania. (Stipulation, ¶25.)

(21) On April 23, 1970 the transportation company had approximately 95,000 paid employees. On the same date the holding company had no paid employees although the holding company had certain unsalaried employees at its offices aforesaid who were also employed by the transportation company. (Stipulation, ¶26.)

(22) At all times since its incorporation, the corporate records, book, accounts and stock transfer records of the holding company have been maintained independently from those of the transportation company. (Stipulation, ¶27.)

(23) On June 20, 1970 the transportation company filed a petition for reorganization under Section 77 of the Bankruptcy Act (11 U.S.C. § 205 et seq.). (Stipulation, ¶28.)

(24) On July 22, 1970 the United States District Court for the Eastern District of Pennsylvania appointed trustees to manage the affairs of the transportation company; thereafter the transportation company has been operated and managed solely by the trustees. (Stipulation, ¶28.)

(25) From its incorporation the holding company has been operated as a holding company and not as a railroad nor a railroad operating company. (Stipulation, ¶30.)

(26) The holding company is a publicly held corporation, the shares of which are traded on the New York Stock Exchange. It presently owns all of the outstanding stock of the transportation company and Penn Central International, N. V. It is not in reorganization and its affairs are managed and controlled, and have been since its incorporation, by its officers and directors. (Stipulation, ¶30.)

(27) The holding company has never owned any railroad property in Connecticut or elsewhere; it has never made any contracts in Connecticut nor any contracts to be performed in Connecticut; it has had no office in Connecticut and never had any agents or employees in Connecticut; it has never been autho-

rized to do business in Connecticut and has never done any business in Connecticut; and it has never had any agent for the service of process in Connecticut. (Stipulation, ¶31.)

(28) On the other hand, the transportation company on April 23, 1970 owned real and personal property in Connecticut, made and performed contracts in Connecticut, had an office and employees in Connecticut and had an agent for the service of process in Connecticut and was doing business in Connecticut. (Stipulation, ¶32.)

(29) On April 23, 1970, in addition to railroad operating property, the transportation company had certain non-railroad wholly-owned or majority-owned subsidiaries. (Stipulation, ¶33.)

Having recited the pertinent facts as stipulated to, I turn to a discussion of the applicable law.

## APPLICABLE LAW

The party asserting federal jurisdiction has the burden of proving the essential facts by a preponderance of the evidence. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Therefore, plaintiff, Joel McPheron, has the burden of proving by a preponderance of the evidence that this court has *in personam* jurisdiction over defendant holding company, a foreign corporation not licensed to do business in Connecticut.

In a diversity action the federal court must apply the state standards for determining a defendant's amenability to service of process, so long as those standards are not inconsistent with constitutional due process requirements. Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir. 1963). This court, therefore, must apply the state standards of Connecticut in deciding the question of jurisdiction.

Plaintiff contends that the holding company was "present" in Connecticut through its wholly-owned subsidiary, the defendant transportation com-

pany, and that for purposes of jurisdiction, service was properly made under the Connecticut long-arm statute, Connecticut General Statute § 33–411. However, before this statute can be utilized as a basis for the exercise of jurisdiction over the unlicensed foreign corporation, the corporate veil must be pierced so that the acts of its domestic subsidiary can be imputed to the absent parent. See, e. g., United States v. Montreal Trust Co., 358 F.2d 239 (2d Cir.), cert. denied, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966).

Therefore, in order to prevail on this disputed jurisdictional issue plaintiff must establish that under Connecticut law the facts above stipulated to are sufficient to warrant the piercing of the corporate veil between the holding company and the transportation company.

Concerning the issue of piercing the corporate veil for jurisdictional purposes, the leading case is Cannon Mfg. Co. v. Cudahy Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). In that case an unlicensed Alabama corporation was sued in North Carolina and the alleged basis of jurisdiction was that the defendant was present because it was doing business in the state through a wholly-owned North Carolina subsidiary. At the outset the Supreme Court noted:

"The main question for decision is whether, at the time of the service of process, defendant was doing business within the State in such a manner and to such an extent as to warrant the inference that it was present there. . . . In order to show that it was, the plaintiff undertook to establish identity pro hac vice between the defendant and the Alabama corporation. The Alabama corporation, which has an office in North Carolina, is the instrumentality employed to market Cudahy products within the State; but it does not do so as defendant's agent. It buys from the defendant and sells to dealers. In fulfilment of such contracts to sell, goods packed by the defendant in Iowa are shipped direct to dealers, and from them the Alabama

corporation collects the purchase price. Through ownership of the entire capital stock and otherwise, the defendant dominates the Alabama corporation, immediately and completely, and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the Cudahy products in other States. The existence of the Alabama company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate.

All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations. This corporate separation from the general Cudahy business was doubtless adopted solely to secure to the defendant some advantage under local laws." (267 U.S. at 334–335, 45 S.Ct. at 250)

Continuing, the court noted that the question was "simply whether the corporate separation carefully maintained must be ignored in determining the existence of jurisdiction;" and the court concluded that it should not be, stating:

"The defendant wanted to have business transactions with persons resident in North Carolina, but for reasons satisfactory to itself did not choose to enter the State in its corporate capacity. It might have conducted such business through an independent agency without subjecting itself to the jurisdiction. . . . It preferred to employ a subsidiary corporation. Congress has not provided that a corporation of one State shall be amenable to suit in the federal court for another State in which the plaintiff resides, whenever it employs a subsidiary corporation as the instrumentality for doing business therein. . . . That such use of a subsidiary does not necessarily subject the parent corporation to the jurisdiction was settled by

Conley v. Mathieson Alkali Works, 190 U.S. 406, 409–11 [23 S.Ct. 728, 47 L. Ed. 1113]; Peterson v. Chicago, Rock Island & Pacific Ry. Co., 205 U.S. 364 [27 S.Ct. 513, 51 L.Ed. 841], and People's Tobacco Co., Ltd. v. American Tobacco Co., 246 U.S. 79, 37, [38 S. Ct. 233, 62 L.Ed. 587.], Ann.Cas.1918c, 537. In the case at bar, the identity of interest may have been more complete and the exercise of control over the subsidiary more intimate than in the three cases cited, but that fact has, in the absence of an applicable statute, no legal signficance. The corporate separation, though perhaps merely formal, was real. It was not pure fiction." (267 U.S. at 336–337, 45 S.Ct. at 251)

While *Cannon* considered the jurisdiction issue in the context of the utilization of the "doing business" statute as the legislative vehicle to obtain jurisdiction over the absent defendant, that fact does not make the court's reasoning any less applicable to a case where, as here, service was attempted under a long-arm statute. It is clear that before either statute can be utilized as a basis for the exercise of jurisdiction over the unlicensed foreign corporation, the corporate veil must be pierced so that the acts of the domestic subsidiary can be imputed to the absent parent. See e. g., United States v. Montreal Trust Company, *supra.*

That Connecticut courts apply the *Cannon* rationale in determining whether the corporate veil should be pierced for purposes of jurisdiction was reaffirmed in ACS Industries, Inc. v. Keller Industries, Inc., 296 F.Supp. 1160 (D.Conn. 1969). In that case the defendant, an unlicensed foreign corporation, moved to dismiss, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, for lack of *in personam* jurisdiction in a diversity action where the alleged basis for the exercise of jurisdiction was the existence of a wholly-owned subsidiary in Connecticut. The court quoted at length from the *Cannon* opinion and concluded:

"The [Supreme] Court held that regardless of the identity of interest and high degree of control which the parent exercised, the formal separation was sufficiently real to resist jurisdiction. The recognition in *Cannon* of the reality of formal corporate separateness remains viable to this date, although in other areas of the law substance has triumphed over form. Therefore, the only question before the Court is whether plaintiff has made a threshold demonstration that Keller and Vent Control failed to maintain that degree of formal separateness found adequate in *Cannon*." ACS Industries, Inc. *supra,* 296 F.Supp. at 1162.

The court in *ACS Industries, Inc.* then reviewed a number of decisions which invoked or rejected the *Cannon* rule in an attempt to ascertain what sort of factual showing must be presented by a plaintiff in order to establish that the two corporations failed to maintain the degree of formal separateness found sufficient in *Cannon* and thereby avoid the granting of a motion to dismiss:

"It is infrequent that the *Cannon* rationale has been overcome and jurisdiction sustained against a foreign parent on a foreign cause of action by service on a "local" subsidiary. See 2 Moore's Federal Practice ¶ 4.22[2], at 1226–28 (1967). In fact, it may be that only Beech Aircraft Corporation has exercised the requisite degree of control over its subsidiaries to have been subjected to jurisdiction in such situations. The Beech trilogy includes Szantay v. Beech Aircraft Corp., 237 F.Supp. 393 (E.D.S.C.), aff'd, 349 F.2d 60 (4 Cir. 1965); Scalise v. Beech Aircraft Corp., 276 F.Supp. 58 (E.D.Pa. 1967); and Dunn v. Beech Aircraft Corp., 276 F.Supp. 91 (E.D.Pa.1967). Beech's relationship with its distributor was shown by analysis of their intercorporate contracts and memoranda, and by depositions. Its agreement provided that the distributor's staff and service must be accept-

able to Beech, inventory would be prescribed by Beech, parts would be supplied by Beech, and facilities would be provided as deemed necessary by Beech. Beech provided pricing guidelines, established minimum quotas, supplied all advertising, limited territory, regulated accounting procedures and controlled warranties, servicing and other aspects of sales. The distributor was pledged to do whatever "Beech may consider essential to the development of [its] territory." Szantay, supra, 237 F.Supp. at 399–400.

In Scalise, the court first dismissed as to one parent and then retained jurisdiction as to Beech. This appears to have been a decision not to pierce the corporate veil although the officers and directors are the same so long as they can be said to wear two hats and operate in theoretically distinct capacities for each entity. However, where the alleged agency or alter ego claim is based upon an agreement whereby one corporate entity is made subordinate to the other, the veil will be pierced."

*ACS Industries, Inc., supra,* 296 F. Supp. at 1163.

Pointing to undisputed evidence that established that, pursuant to an understanding between the parent and the subsidiary, the parent controlled the every-day activities of the domestic subsidiary, the court denied defendant's motion to dismiss, stating:

> "Here, as in the Beech cases, it appears that actual corporate control and not individual control is being exercised. Although this distinction is a fine one, the absence of any information to the contrary precludes the Court from speculating on the actual corporate interrelationships." *ACS Industries, Inc., supra,* 296 F.Supp. at 1164.

The defendant holding company contends that *Cannon* and *ACS Industries, Inc.* govern the situation at hand. The plaintiff argues, however, that *Cannon* only serves to place outside limits on the exercise of *in personam* jurisdiction by the Connecticut courts. It is plaintiff's contention that the Connecticut courts subscribe to both the "instrumentality rule" and the "identity rule" in determining whether to pierce the corporate veil for jurisdictional purposes. Zaist v. Olson, 154 Conn. 563, 575, 227 A.2d 552 (1967).

Although the court disagrees with this contention of plaintiff, as discussed below, it is appropriate here to discuss plaintiff's argument as to the applicable Connecticut law and the circumstances under which corporate separateness will be disregarded for jurisdictional purposes. In *Zaist,* the Connecticut Supreme Court stated:

> "The instrumentality rule requires, in any case but an express agency proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." 154 Conn. at 575, 227 A.2d at 558.

Further in the same opinion the court discussed the identity rule:

> "Complementing the instrumentality rule is the identity rule. Powell, op. cit. § 24. Its application is illustrated in Luckenbach S. S. Co. v. W. R. Grace & Co., 267 F. 676 (4th Cir.) In that case, Edgar F. Luckenbach owned 94 per cent of the stock of the Luckenbach Steamship Company and almost 90 per cent of the stock of the Luckenbach Company. The Luck-

952

enbach Steamship Company had a capital of $10,000 and owned no ships. The Luckenbach Company was capitalized at $800,000 and did own ships which it leased to the steamship company. Both corporations had the same officers and directors, and Luckenbach was president of and personally managed both. When the steamship company defaulted on a contract with W. R. Grace and Company, the latter, in a suit against the two corporations, was allowed recovery against the Luckenbach Company. The Court said (p. 681): 'For all practical purposes the two concerns are one and it would be unconscionable to allow the owner of this fleet of steamers, worth millions of dollars, to escape liability because it had turned them over a year before to a $10,000 corporation, which is simply itself in another form.' The proposition has been otherwise expressed as follows: 'If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.' Mull v. Colt Co., 31 F.R.D. 154, 163 (S.D.N.Y.); Walkovszky v. Carlton, 24 A.D.2d 582, 583, 262 N.Y. S.2d 334."

*Zaist, supra,* 154 Conn. at 575–576, 227 A.2d at 558.

In *Zaist,* the court applied the instrumentality rule to pierce the corporate veil of a domestic corporation. The court held that the sole stockholder, also domiciled in Connecticut, was liable for the corporation's obligations to plaintiff for services ostensibly rendered by plaintiff to the corporation but whose benefit was received by the individual defendant. Without further discussion thereof, the facts in *Zaist* established "beyond question" the three requisite elements for holding that the corporation was a mere instrumentality of the individual defendant. *Zaist, supra,* 154 Conn. 576, 577, 227 A.2d 552.

Plaintiff also cites Connecticut Co. v. New York, N. H. & H. R. Co., 94 Conn. 13, 107 A. 646 (1919) as authority for plaintiff's reliance on the instrumentality and identity tests for determining whether the corporate veil should be pierced for purposes of jurisdiction. In that case the court applied both tests in piercing the corporate veil to hold the parent corporation liable for the obligations of its subsidiary. There the court noted as follows:

"It is unnecessary to follow that history in all its details. It is sufficient to note the salient facts that the Connecticut Company, from the time of its acquisition by the old New York, New Haven & Hartford Railroad Company, has continued to be owned absolutely by the latter company or its successor bearing the same name, that at all times its boards of directors have been composed entirely of men who at the same time were directors of these companies; that its executive officers have been identical with theirs or substantially so; that many of its department heads were in their employ in similar positions, and that its management and operation throughout has been that of their agency or instrumentality, acting under their immediate direction and in closest co-operation with them to advance their interests and accomplish their purposes. It has been something more than the ordinary subsidiary of the New Haven Company. It has been in the fullest sense one of its arms completely subject to its bidding and having no other conceivable purpose for its existence than to advance its interests by action conformable to its will and direction. The two corporations were indeed separate corporate entities and bore different names, but here the difference between them ended. In all other respects they were one. More

complete unity, whether of purpose, control, management or ultimate interest, could not be imagined than existed between them. It is only in the shadows cast by legal technicalities that a lack of unity can be discerned. Looking through these shadows to discover the substance of things, as courts are now wont to do, to the end that fraud may be defeated, obligations and responsibilities not evaded and the ends of justice subserved, only one real ownership and interest can be seen in the situation produced by the transfer in form from the New Haven Company to the Connecticut Company."

Connecticut Co. v. New York, N. H. & H. R. Co., *supra*, 94 Conn. at 25–26, 107 A. at 650.

In this case, as in *Zaist, supra,* the court also found the three aforesaid requisite elements for holding that the subsidiary was a mere instrumentality of the parent, but also recognized the general rule that the corporate veil will not be pierced except under extraordinary circumstances:

"From the time of the acquisition by New York, New Haven & Hartford Railroad Company of the charter of the Connecticut Company down through the whole period of its history, it has been developed, managed, controlled, and utilized solely as an agency, instrumentality, or adjunct of the acquiring company and its successor the New Haven Company for the advancement of their purposes and the achievement of their ends as their pleasure dictated. Under such circumstances, the general rule which recognizes the individuality of corporate entities and the independent character of each in respect to their corporate transactions and the obligations incurred by each in the course of such transactions will be disregarded, where, as here, the interests of justice and righteous dealing so demand." Connecticut Co. v. New York, N. H. & H. R. Co., *supra*, 94 Conn. at 26–27, 107 A. at 651.

Again in this case, as in *Zaist, supra,* there were no non-resident parties and jurisdiction was not an issue.

■ As stated above, this court disagrees wtih plaintiff's contention as to the applicable law in determining whether to pierce the corporate veil for jurisdictional purposes. Plaintiff seeks to rely on a number of Connecticut cases which formulate tests to determine the substantive liability of corporations rather than *in personam* jurisdiction over corporations. A clear distinction, however, must be drawn between jurisdictional and liability concepts when considering contentions that the corporate veil should be pierced. Cannon Mfg. Co. v. Cudahy Co., *supra*; ACS Industries Inc. v. Keller Industries, Inc., *supra;* Powell, Parent and Subsidiary Corporations, pp. 138–151 (1931). Cases concerning substantive rights have no application to the question of whether the corporate entity may be ignored for purposes of jurisdiction. Cannon Mfg. Co. v. Cudahy Co., *supra.* Powell, Parent and Subsidiary Corporations, states:

"And the rule is now settled that although the circumstances may be such as to render the parent corporation liable under the Instrumentality Rule for the obligations of its subsidiary, they will not generally justify the ignoring of the corporate entity of the subsidiary to the extent of holding that the parent may be 'found' within the district on the theory that the parent and subsidiary are identical and that the business of the subsidiary constitutes the business of the parent." Powell, *supra* at 145.

It is clear that plaintiff's reliance is misplaced.

■ Plaintiff also argues that the corporate veil should be pierced for jurisdictional purposes because the parent corporation in the present action is a holding company. In support of that proposition plaintiff cites Steinway v. Majestic Amusement Co., 179 F.2d 681, 683 (10th Cir. 1949). Plaintiff quotes in

his brief, page 10, the following language from *Steinway:*

"Where a nonresident corporation is organized for the very purpose of holding and controlling the stock of a resident corporation and thus manages and directs the internal affairs of the resident corporation, courts have disregarded the corporate entity and treated it as an alter ego of the nonresident corporation for the purpose of service of process." 179 F.2d at 683.

It is important to note that the above language is dictum and thereafter the Tenth Circuit Court of Appeals recognized the applicability of *Cannon* and affirmed the dismissal of the action by the lower court for lack of personal jurisdiction over the foreign corporation, stating:

. "But, none of the cases we have seen go so far as to hold mere ownership and voting of a majority of the stock of a resident or domesticated corporation by a nonresident corporation sufficient to justify ignoring the corporate entity for the purpose of service of process. On the contrary, the cases relied upon by the trial court hold without deviation that mere ownership and voting of the majority stock of a resident or domesticated corporation in the state does not constitute 'doing business' therein, in a manner to make it amenable to personal service, even though by so doing it elects the corporate officers, thus indirectly controlling corporate affairs." *Steinway, supra,* 179 F.2d at 683.

Plaintiff's reliance on the dictum in *Steinway* is misplaced as is his reliance on the applicability of the substantive liability rules to determine jurisdiction. ■■ This court holds that *Cannon, supra,* and *ACS Industries, Inc., supra,* are recognized by the Connecticut courts as controlling authority when interpreting the circumstances under which a Connecticut court will pierce the corporate veil for jurisdictional purposes. This court further holds that the substantive liability rules, namely the instrumentality and identity rules as subscribed to in *Zaist, supra,* and Connecticut Co. v. New York, N. H. & H. R. Co., *supra,* are controlling authority on the issue of whether the holding company will be held liable for the torts of its subsidiary, the transportation company.

■ The initial question presented is whether the facts of the now-completed record concerning the holding company's relationship with its wholly-owned subsidiary transportation company warrant a finding for jurisdictional purposes that the holding company was, on the date of the accident, present or doing business in Connecticut through its subsidiary.

In an earlier ruling by Magistrate Latimer on the defendant holding company's motion to dismiss for lack of jurisdiction, this court recognized the applicability of *Cannon* and *ACS Industries, Inc.,* but denied the motion on the basis of a then-incomplete record. In that earlier ruling this court stated that *Cannon* represented "[t]he traditional rule [which] has compelled recognition of formal corporate separation between parent and subsidiary when the formal status of each as a distinct entity has been carefully maintained, even if control is inevitably exercised in an effective sense by the parent company through such means as stockownership." Memorandum Decision, June 16, 1972, page 2. While noting that the Connecticut courts had not defined the circumstances under which corporate separateness may be disregarded for jurisdictional purposes, the court, citing ACS Industries, Inc. v. Keller Industries, Inc., *supra,* recognized *Cannon* as controlling authority in this court.

"This Court has indicated that the [Cannon] rule remains viable, that inter-corporate adherence to the forms of separation will be respected even when management personnel are the same if the identical sets of officers and directors operate in theoretically distinct capacities for each entity and the admittedly fine distinction between control by the same individuals and

'actual corporate control' is supported by the evidence." Memorandum Decision, June 16, 1972, p. 3.

In applying the *Cannon* rule to the present action, the court at that time noted that there existed no evidence that the corporate formalities of separate corporate existence were ignored by either the holding company or the transportation company. In view of that finding, the court recognized that evidence of common officers and directors, common offices, and ownership of all of the outstanding stock of the subsidiary by the parent would be insufficient under *Cannon* to permit the court to ignore the formal corporate separateness of the holding company and the transportation company. The court, however, refused to dismiss the action, stating:

> "The critical factor in this case is simply that the parent is a holding company, and the Court can infer no significant purpose in the parent company's organization other than that of holding and controlling the subsidiary operating company's stock. In these circumstances, the parent corporation's commercial function is none other than the control of its subsidiary's affairs." Memorandum Decision, June 16, 1972, p. 5.

The court recognized that its refusal to dismiss the action against the holding company was tentative since the court at that time had to draw inferences concerning the purpose for the formation of the holding company and the ensuing relationship between the holding company and the transportation company. Memorandum Decision, June 16, 1972, pp. 5–6. Indeed, the court expressly noted this deficiency in its holding and expressed no opinion as to whether the holding company and transportation company should be treated as one for jurisdictional purposes when the record was supplemented.

On the basis of the completed record this court is now of the opinion that it was incorrect when it earlier inferred that there was "no significant purpose in the parent company's organization other than that of holding and controlling the subsidiary operating company's stock."

The present record establishes that the holding company was formed for the purpose of facilitating a program of corporate acquisition and diversification and, indeed, had engaged in commercial activities pursuant to that purpose. (Stipulation, ¶¶ 19, 20, 21, 22, 23.)

The business purposes of the holding company were stated in the pre-incorporation proxy materials, the transcript of the May 13, 1969 Annual Meeting and the Report of the Annual Meeting. (Stipulation, ¶ 19.) It was anticipated that the acquisitions would be accomplished by the issuance of additional securities and that the creation of the holding company would permit less complicated, costly and time-consuming procedures in that regard since the issuance and sale of securities by the holding company would be regulated by the Securities and Exchange Commission rather than the Interstate Commerce Commission. Furthermore, it was anticipated that the holding company's securities would be more attractive to the investing public and would more accurately reflect the broader scope and diversified nature of the program to be undertaken. Also, it was anticipated that the holding company would facilitate a program of corporate simplification in accordance with an outstanding order of the Interstate Commerce Commission. (Stipulation, ¶ 19.)

It should be noted that, by the terms of the stipulated facts, these stated purposes were no more than "anticipation" on the part of the directors of the transportation company seeking stockholder ratification and that these stated purposes are not proof, in and of themselves, of any actual business purposes of the holding company nor are they proof of any significant, useful purpose independent of the transportation company. However, viewed in the light of the subsequent commercial transactions of the holding company, these stated business purposes appear to be more than

merely an optimistic campaign to gain stockholder approval of the new holding company.

The present record clearly establishes that the holding company engaged in significant commercial transactions following its organization. Shortly after its formation, the holding company organized Penn Central International, N. V., a wholly-owned subsidiary, to obtain financing from foreign sources. (Stipulation, ¶ 22.) In February, 1970 the holding company acquired Southwestern Oil and Refining Company, a Texas corporation which operated a 50,000 barrel a day refinery in Corpus Christi, Texas. It also acquired Royal Petroleum Corporation, a New York corporation which distributed fuel oil in the New York area and operated a deep water marine terminal and bulk storage station at Sewaren, New Jersey. (Stipulation, ¶ 20.) On April 23, 1970, the date of plaintiff's accident, the holding company owned all of the outstanding stock of Southwestern, Royal and Penn Central International, N. V. (Stipulation, ¶ 23.)

On the basis of the present record it is apparent that the holding company's commercial function was not the control of the transportation company's affairs. On the contrary, the holding company's commercial function was, as stated in the proxy materials, to facilitate the acquisition of non-railroad properties, etc., and to that end the holding company had engaged in substantial commercial transactions as of the date of the accident. Indeed, this evidence in the record clearly establishes that the holding company was formed for legitimate business reasons unrelated to the operation of the railroad.

The other pertinent facts of record in the instant action are clear-cut. In support of plaintiff's argument, the facts may be summarized briefly, as follows: On the date of the accident the holding company and the transportation company occupied executive offices at the same address, the ten executive officers of the holding company held identical positions with the transportation company, the directors of the holding company constitu-

ted a two-thirds majority of the subsidiary's larger board and the holding company owned all the outstanding stock of its subsidiary; the transportation company had 95,000 paid employees and the holding company had none, although the holding company had certain unsalaried employees at its office in Philadelphia, Pennsylvania who were also employed by the transportation company. (Stipulation, ¶¶ 24, 25, 26.) However, under the *Cannon* rule these facts alone are not sufficient; there is no evidence of confusion of books, records or accounts nor any other similar indication that the formalities of separate corporate existence were ignored by either parent or subsidiary. (Stipulations, ¶¶ 27, 30, 31.) The intercorporate relationship presents all the classic features involved in the application of the *Cannon* rule.

This court holds that Connecticut courts would strictly apply the *Cannon* principle of formalism to the facts of the present record and find that the holding company was not present or doing business in Connecticut through its subsidiary.

Accordingly, it is apparent that there exists no basis in fact or law for this court to treat the holding company and transportation company as one for purposes of jurisdiction.

Having determined that this court has no *in personam* jurisdiction over defendant Penn Central Co., it follows *a fortiori* that this court has no jurisdiction to decide the question of liability of the holding company. Pursuant to this determination, I dismiss the action against defendant Penn Central Co. in the Connecticut action, file B–313.

Settle order on notice, promptly, at the United States Courthouse in Bridgeport, Connecticut.

### STIPULATION OF FACT

1. The plaintiff is a citizen of the State of Connecticut.

2. The Penn Central Company is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

3. The Penn Central Transportation Company is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

4. The amount in controversy in this action exceeds, exclusive of interest and costs, the sum of Ten Thousand ($10,000.00) Dollars.

5. On April 23, 1970, the plaintiff was a passenger on a train owned and operated by the Penn Central Transportation Company, known as the 6:08 p. m. train, eastbound from Grand Central Station, New York, New York to Connecticut.

6. Plaintiff's injuries, if any, were sustained in Connecticut on April 23, 1970.

7. The Pennsylvania Railroad Company was organized as a railroad operating company in 1846, pursuant to a special act of the Pennsylvania legislature.

8. On February 1, 1968, the New York Central Railroad Company merged into the Pennsylvania Railroad Company.

9. To reflect the fact that it included the former New York Central railroad system, the name of this railroad operating company was changed to Penn Central Company on May 1, 1968.

10. On January 1, 1969, the New York, New Haven & Hartford Railroad Company was included in the railroad system of the Penn Central Company.

11. In January, 1969, the Board of Directors of the Penn Central Company (as the railroad operating company was then known) approved in principle the creation of a new corporation, a holding company whose shares would be publicly held, which in turn would own all of the outstanding stock of the railroad operating company.

12. On February 26, 1969, the Board of Directors of the Penn Central Company (as the railroad operating company was then known) approved the steps necessary to create said holding company, including an election to be governed by the Pennsylvania Business Corporation Law, a proposal to amend its Articles of Incorporation, approval of the formation of the holding company, approval of a Plan of Merger and Reorganization, and resolutions to submit the proposed amendment to the Articles of Incorporation and the Plan of Merger and Reorganization to the stockholders.

13. On April 1, 1969, pursuant to the Plan of Merger and Reorganization, the Penn Central Holding Company was organized under the laws of Pennsylvania.

14. On May 13, 1969, at the Annual Meeting and Election of the Penn Central Company (as the railroad operating company was then known), the stockholders approved the adoption of amended and restated Articles of Incorporation and the Plan of Merger and Reorganization by which the holding company would be established.

15. The Plan of Merger and Reorganization became effective on October 1, 1969, at which time the name of the holding company was changed from Penn Central Holding Company to Penn Central Company, and the name of the railroad operating company was changed from Penn Central Company to Penn Central Transportation Company.

16. The Penn Central Company ("holding company") named as a defendant in the present action, is the holding company created in accordance with the Plan of Merger and Reorganization, and was formerly known as the Penn Central Holding Company.

17. The Penn Central Transportation Company ("transportation company"), also named as a defendant herein, is a railroad operating company formerly known as the Penn Central Company.

18. Following the creation of the holding company and at all times thereafter all of the assets, equipment, rolling stock, physical plant, and right-of-way including buildings, railroad stations, signals and improvements thereon previously owned by the transportation company remained the property of the transportation company.

19. The stated business purpose for incorporation of the holding company, as

expressed in the 1969 proxy materials, the transcript of the May 13, 1969 Annual Meeting, and the Report of the Annual Meeting was to facilitate a program of diversification designed to encourage growth and financial stability. The following specifically appear in the 1969 proxy materials, the transcript of the May 13, 1969 Annual Meeting, and the Report of the Annual Meeting:

a. It was anticipated that the creation of the holding company would result in a strengthened financial position, permitting both growth and stability of earnings.

b. It was anticipated that the creation of the holding company would facilitate an aggressive and sound program of acquisition.

c. It was anticipated that such acquisitions would require the issue of additional securities, and that the creation of the holding company would permit less complicated, costly, and time-consuming procedures in that regard, since the issuance and sale of securities by the holding company would be regulated by the Securities and Exchange Commission rather than the Interstate Commerce Commission.

d. It was anticipated that the securities issued by the holding company would be more attractive to the investing public, and would more accurately reflect the broader scope and diversified nature of the program to be undertaken.

e. It was anticipated that the creation of the holding company would provide significantly greater flexibility in arranging and managing financing.

f. It was anticipated that the existence of the holding company would facilitate a program of corporate simplification, in accordance with an outstanding order from the Interstate Commerce Commission.

g. It was anticipated that the holding company would engage in an active program of acquisition and diversification in order to develop multiple sources of income and variety of growth and income-producing investments.

20. In February, 1970, the holding company acquired Southwestern Oil and Refining Company ("Southwestern"), a Texas corporation, having its principal place of business in Corpus Christi, Texas, and Royal Petroleum Corporation ("Royal"), a New York corporation, having a principal place of business in New York, New York. At the time of the acquisition Southwestern operated a 50,000 barrel per day refinery and Royal was a wholesale distributor of fuel oil in the metropolitan New York area and operated a deep water marine terminal and bulk storage station at Sewaren, New Jersey. At the time of acquisition Southwestern and Royal had combined annual gross revenues of 90 million dollars.

21. The acquisition of Southwestern and Royal was accomplished by the issuance of 400,000 shares of $3 cumulative preference stock by the holding company and the exchange of such stock for all the outstanding stock of Southwestern and Royal.

22. Subsequent to the effective date of the Plan of Merger and Reorganization, the holding company organized Penn Central International N. V., a wholly-owned subsidiary organized to obtain financing from foreign sources.

23. On April 23, 1970, the holding company owned all of the outstanding capital stock of the transportation company, Penn Central International, N. V., Southwestern and Royal.

24. On April 23, 1970, the affairs of the holding company were controlled and managed by its ten executive officers and its fourteen dirctors. Each of these executive officers was located in Philadelphia and each occupied a similar position with the transportation company. The transportation company had thirty-nine executive officers, located at its main office at Six Penn Center Plaza, Philadelphia, Pennsylvania and in its regional offices. Each of the fourteen directors of the holding company was

also a member of the transportation company's twenty-one man Board of Directors.

25. On April 23, 1970, the holding company and the transportation company occupied the same offices at Six Penn Center Plaza, Philadelphia, Pennsylvania.

26. On April 23, 1970, the transportation company had approximately 95,-000 paid employees. On the same date the holding company had no paid employees, although the holding company had certain unsalaried employees at its offices in Philadelphia, Pennsylvania who were also employed by the transportation company.

27. At all times since its incorporation, the corporate records, books, accounts, and stock transfer records of the holding company have been maintained independently from those of the transportation company.

28. On June 20, 1970, the transportation company filed a petition for reorganization under Section 77 of the Bankruptcy Act (11 U.S.C. § 205 et seq.). On July 22, 1970, the United States District Court for the Eastern District of Pennsylvania appointed Trustees to manage the affairs of the transportation company. The transportation company has been operated and managed solely by the Trustees since their appointment.

29. On June 30, 1970, shortly after the transportation company filed its petition for reorganization, the former shareholders of Southwestern and Royal demanded rescission of the agreement by which the holding company acquired the stock of Southwestern and Royal. Following the institution of legal proceedings in the United States District Court for the Southern District of Texas, Corpus Christi Division, by counsel for the former shareholders of Southwestern and Royal, a settlement agreement was entered into wherein the holding company agreed to rescind the stock purchase agreement with Southwestern and Royal in exchange for payment of two and one-half million dollars in dividends due on the Southwestern and Royal stock and return of the 400,000 shares of $3 cumulative preference stock. Thereafter, the holding company returned the Southwestern and Royal stock to the former shareholders of Southwestern and Royal and, in turn, received two and one-half million dollars and the 400,000 shares of $3 cumulative preference stock it had given to the former shareholders of Southwestern and Royal.

30. From its incorporation the holding company has been operated as a holding company and not a railroad operating company. The holding company is a publicly held corporation, the shares of which are traded on the New York Stock Exchange. It presently owns all of the outstanding stock of the transporation company and Penn Central International, N. V. It is not in reorganization, and its affairs are managed and controlled, and have been since its incorporation, by its officers and directors.

31. The holding company has never owned any railroad property in Connecticut or elsewhere; it has never owned any real or personal property in Connecticut; it has never made any contracts in Connecticut, nor any contracts to be performed in Connecticut; it has never manufactured or distributed goods for use in Connecticut; it has never had any office in Connecticut and has never had any agents or employees in Connecticut; it has never been authorized to do business in Connecticut, and has never done any business in Connecticut; and it has never had any agent for the service of process in Connecticut.

32. On April 23, 1970, the transportation company owned real and personal property in Connecticut, made and performed contracts in Connecticut, had an office and employees in Connecticut, had an agent for service of process in Connecticut, and was doing business in Connecticut.

33. On April 23, 1970, in addition to railroad operating property, the transportation company had certain nonrailroad wholly-owned or majority-owned subsidiaries.

Dated: November 19, 1974