NATHAN·H. DAHL *v.* EDWIN MOSS AND SON, INC.

MALTBIE, C. J., BROWN, JENNINGS, ELLS AND DICKENSON, Js.

148

Submitted on briefs June 8—decided November 15, 1949.

*Frederick L. Comley,* on the brief for the appellant (defendant).

*Samuel Reich, Adrian W. Maher* and *George A. Saden,* on the brief for the appellee (plaintiff).

MALTBIE, C. J.   This is an action arising out of contract wherein the plaintiff, an electrical contractor, seeks damages from the defendant, a general contractor, for material and labor which he furnished and which he claims were not called for by the contract.

The complaint is in two counts. In the first, the plaintiff seeks to recover extra expenses to which he was put because he was required to install an underfloor duct of a type not called for in the contract and specifications and because of a claimed change in the plan of procedure in which the work was to be done. In the second count, recovery is sought upon the basis of an agreement by the defendant to pay the plaintiff the difference between the cost of the type of duct upon which he had figured the amount for which he would do the work and the cost of the type of duct he was required to install. The defendant has appealed from a judgment for the plaintiff.

The facts found, in which no material change can be made, present this situation: The plaintiff is an experienced and capable electrical contractor. The defendant has been engaged for many years in the general contracting business. Edwin H. Moss, the defendant's president, and Robert S. Moss, its secretary and treasurer, are its agents for all purposes. During 1943 the Chance Vought Aircraft Division of the United Aircraft Corporation, hereinafter called Chance Vought, was engaged in constructing airplanes for the United States navy in a factory in Stratford, Connecticut. In that year it had a contract with the navy department to build a two-story factory extension, which would be owned by the navy, at its Stratford plant. In September, 1943, Chance Vought entered into a subcontract with the defendant, by the terms of which the defendant was to erect the extension. The plaintiff, at the defendant's request, submitted a bid for the electrical work required. On October 27, 1943, the defendant signed a "Purchase Order" addressed to the plaintiff, the material portion of which was as follows: "Furnish all necessary labor and materials for a complete job of Electrical Work all in strict accordance with plans,

specifications, and addenda prepared by Albert Kahn Associates and subject to the approval of Albert Kahn Associates, for the sum of $103,000.00." Albert Kahn Associates was the firm of architects in charge of the construction of the building and we shall hereafter refer to it as the architect.

The factory was in use by Chance Vought. The specifications contained a statement that it was the intention of the owner first to complete the part of the extension extending from column lines S to J, and the plaintiff figured the amount of his bid on that basis. On the north side of the existing building was a driveway and loading dock which Chance Vought deemed necessary to the efficient operation of its factory. It required the defendant to keep the dock open and unobstructed until a new loading dock could be built elsewhere, and it ordered the defendant to change its plan of procedure to accomplish that result. This the defendant did. The plaintiff's plan of installation had to be changed and additional financial burdens were thereby imposed upon him. The plaintiff knew of the presence of the dock but did not know that its use would interfere with the procedure in carrying on the work. He spoke to Edwin Moss about the shift in the plan of operation, stating that it would result in additional cost, and Moss said that he would have the same experience and was going to take the matter up with Chance Vought. He did ask Chance Vought to pay his company additional sums so that the plaintiff might be compensated. The plaintiff later demanded that the defendant pay him the extra expense but the defendant refused to do so.

Included in the plaintiff's work was the laying of 10,000 feet of underfloor duct, a device for carrying electric and other wires beneath the floor surface. In submitting his bid, the plaintiff contemplated using a

round fiber duct, which would cost $1500. The plaintiff incorporated the round fiber duct in the list of materials he proposed to use, which was submitted to the architect. The architect disapproved the use of this duct, stating that in its opinion the duct did not meet the specifications, and, in the words of the finding, "would not install an underground duct system." At a conference between the plaintiff and Edwin Moss on December 25, 1943, it was agreed that the duct which the plaintiff proposed to install met the specifications. A General Electric Company duct met the approval of the architect but would cost the plaintiff substantially more than the duct he proposed to install. He told Moss that he could not proceed with the job if the General Electric duct was required. Moss then directed the plaintiff to install the General Electric duct and said that the defendant would take care of the additional cost due to its purchase and installation and would fight the matter out with Chance Vought. The plaintiff then and thereafter protested against this installation, but, relying on the defendant's promise, he installed the General Electric duct system. The cost to the plaintiff in buying and installing the General Electric duct with its appliances was $7800 in excess of the expense of installing a round fiber duct.

We consider first the claim of damages due to the change in the order in which the work was to be done. The provision in the contract upon which the plaintiff relies is as follows: "It is the intention of the Owner to complete that part of the Addition first extending from column lines S to J so that this portion of the Addition can be placed in operation before the completion of the entire Addition. It is not the intention to delay the construction of the balance of the structure except to give preference to that portion between column lines S and J." But the contract also provides: "The Con-

tractor will continue his operations in present Building. . . . The Subcontractors are to consult with the Architect-Engineer's Superintendent as to the methods of carrying on work so as not to interfere with Contractor's operations, as well as to the available space for storage of materials and location of plant, places of access to the work, etc., and all is to be arranged to suit the Contractor's requirements." It is clear from these provisions that the first merely stated an "intention" as to the order in which the work was to be done and that the defendant was obligated to accept such a change as should be reasonably necessary to enable Chance Vought to continue its operations in the existing building; and there is no claim that the change made did not meet this requirement. The plaintiff assumed the risk that such a contingency might occur and he cannot now claim extra compensation on that account. *McCaffrey* v. *Groton & Stonington Street Ry. Co.*, 85 Conn. 584, 587, 84 A. 284; *Whitaker* v. *Cannon Mills Co.*, 132 Conn. 434, 440, 45 A. 2d 120; *Connecticut Co.* v. *New York, N. H. & H. R. Co.*, 94 Conn. 13, 46, 107 A. 646.

The specifications provided: "When required by the specifications, or when called for by the Bureau Representative and Architect-Engineer, the Subcontractor shall furnish the Bureau Representative and Architect-Engineer, for approval, full information concerning the materials or articles which he contemplates incorporating in the work. Samples of materials shall be submitted for approval when so directed. Machinery, equipment, materials and articles installed or used without such approval shall be at the risk of subsequent rejection." In the division of the specifications concerning electrical work, this is stated: "All materials shall be approved by the Architect in writing before the order for materials is placed." When, in the

"Purchase Order" given by the defendant to the plaintiff, it is stated that the work should be done "in strict accordance with plans, specifications and addenda prepared by" the architect and subject to its approval, the last clause certainly meant that, where under the specifications approval of materials or workmanship by the architect was necessary, the requirement would be binding upon the plaintiff. The only requirement in the specifications as to the type of duct was as follows: "Provide and install where shown on plans a complete underfloor duct system, consisting of fibre ducts of approximately 3 sq. in. area, one duct for 110 volt supply and the other for telephone and other low-tension services." Reading the provisions we have quoted together, clearly it was not intended that the plaintiff could install any fiber duct it chose which would meet the requirements as to area and wires to be carried, but that the particular type of duct to be used was subject to the approval of the architect. It had the right under the contract to disapprove the round duct proposed by the plaintiff if in so doing it did not act improperly.

The trial court found that the duct proposed by the plaintiff met the requirements of the specifications and also, after reciting that the architect stated the contrary to be true and that the duct would not install an underfloor duct system, found that the opinion of the architect was erroneous; and one of the conclusions of the court was that the rejection of the duct was unreasonable and unwarranted. Even if we assume that the trial court was correct in these respects, the plaintiff can gain no advantage thereby. Under the contract, the decision of the architect was binding upon the plaintiff if it was made in good faith; that the duct did not meet the specifications was true when the requirement of the architect's approval is taken into

consideration; and, if the architect's statement that the round duct would not install an underfloor duct system was mistaken, that would not invalidate its decision unless it acted in bad faith or under circumstances amounting to it. *Chatfield Co. v. O'Neill,* 89 Conn. 172, 174, 93 A. 133; *Clover Mfg. Co. v. Austin Co.,* 101 Conn. 208, 213, 125 A. 646. The trial court's conclusion that the decision of the architect was unreasonable and unwarranted is insufficient to invalidate the disapproval of the round duct by it.

Finally, the plaintiff seeks to recover on the basis of the promise made to him by Moss that the defendant would take care of the additional cost due to the purchase and installation of the General Electric duct. As approval by the architect of the type of duct was required by the specifications, the plaintiff in installing a duct which was so approved was doing no more than he was required to do by the contract; and Moss's promise therefore lacked consideration and would ordinarily be unenforceable. *Blakeslee v. Water Commissioners,* 106 Conn. 642, 652, 139 A. 106; 1 Williston, Contracts (Rev. Ed.) § 130. The plaintiff relies upon an exception to that rule which we stated in the *Blakeslee* case as follows (p. 655): "Where the contractor can justify his refusal to proceed with the contract by showing that he is confronted with circumstances not contemplated when the contract was made which render its performance impossible or unduly onerous, and the promisor, being informed of the situation, induces him by a promise of additional compensation to proceed with it, the contractor's right to that compensation ought justly to be recognized." We quoted (pp. 656, 657) from cases in other jurisdictions which clearly condition the exception upon a situation which was not within the contemplation of the parties when the contract was made. In this instance, disapproval by the

architect of a duct which the plaintiff might propose to use cannot be held to have been outside the contemplation of the parties when the contract was made. The exception, then, has no application. In *Sasso* v. *K. G. & G. Realty & Construction Co.*, 98 Conn. 571, 120 A. 158, also relied upon by the plaintiff, when the plaintiff was unable to procure certain tile which was required by his contract with the defendant, they agreed that he might use another type of tile and that the defendant would pay the plaintiff the extra cost which would result; there was a change in the contract mutually agreed upon, not a promise to pay additional compensation for material which was within the terms of the original contract. In the present case the facts do not show that the parties entered into a new contract based upon a good consideration.

No claim was made that the defendant would be estopped by reason of its conduct in inducing the plaintiff to proceed to install the General Electric duct, and we do not consider whether or not the plaintiff might recover on that basis.

There is error, the judgment is set aside and the case is remanded to the trial court with direction to enter judgment for the defendant upon the claim for damages because of the change in the order of doing the work, and for a new trial upon the claim for damages for installing the General Electric duct.

In this opinion the other judges concurred.