[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
STATEMENT OF THE CASE
In a prior proceeding, the parties stipulated to a judgment of strict foreclosure. The defendants reserved all defenses till this hearing on the plaintiff's Motion For Deficiency Judgment.
The defendants are general partners of the captioned partnership Sirianni Associates who have guaranteed the partnership obligations to the Union Trust Company.
The obligations are two mortgage loans on which the balance due, with interest and late charges, was $4,715,473.57. The plaintiff claims the foreclosed property had a value of $2,695,000 and seeks a deficiency judgment of $2,292,232.05, which figure included counsel fees, costs and accrued interest.
The defendants have interposed three special defenses and offered evidence purporting to support them. On oral argument, they asserted that the Court had no evidence of value as to the CT Page 7200 real property foreclosed and must find for the defendants.
 I
The plaintiff's expert on the value of the real property was Edward Heberger, a veteran appraiser with impeccable credentials and an excellent reputation. The defendants presented no appraiser of their own, but urge the Court to reject Mr. Heberger's evaluation. The basis for this claim is Mr. Heberger's answer to a question by defendants' counsel in which he stated that the phrase "fair market value" was no longer used by the appraisal community to describe the value placed on property. The defense contends that since he never used that phrase to describe his evaluation, there is no basis for the Court to find a value.
This contention is fallacious and must fail on two grounds. First, plaintiff's counsel posed his question to his expert, seeking his opinion with a reasonable degree of certainty, specifically asking for the "fair market value" (This the Court verified by having the trial tape searched and played).
In addition, the detailed appraisal report, Mr. Heberger's analysis and discussion of his methodology and his opinion present the Court with clear and convincing evidence of the value of the property, satisfying Section 49-14 of the Connecticut General Statutes. The Court finds that the appraisal figure in Mr. Heberger's opinion represented fair market value and was properly accepted by the Court as its evaluation.
The defendants' reliance on New England Savings Bank v. Lopez,227 Conn. 270 (1993) and Eichman v. J J Building Company, Inc. etal, 216 Conn. 443 (1990) is misplaced. The defendants attempt to use Lopez to discredit Mr. Heberger's testimony on the basis of a distinction between fair market value and market value. The Court finds this a distinction without a difference as C.G.S. § 49-14
merely refers to "valuation." The remainder of Lopez is inapposite here because the subject of Lopez is a foreclosure by sale.
Defendants also rely on Eichman v. J.J. Building Company,216 Conn. 443 (1990) to establish the proposition that the Court must determine the value of the property. That proposition is accepted insofar as it goes. However, the defendants fail to recognize that the Court bases the value of property on the evidence presented to it. "Before rendering a deficiency judgment, the Court must have a mechanism for establishing the value of the subject property. . . ." CT Page 7201Fairfield Plumbing Heating Supply Corporation v. Kosa, 220 Conn. 643,647 (1991). Section 49-14 provides for hearing in which both
parties present evidence as to the value of the property. In this case the defendants chose not to present evidence in the form of an appraiser's testimony. The defendants were provided with a meaningful opportunity to present evidence and to challenge the determination of the valuation placed on the property by plaintiff's expert appraiser, Mr. Heberger.
The Eichman case is of use in this case only insofar as it clearly establishes the proposition that the plaintiff must provide credible evidence of fair market value. The Court finds that the plaintiff did so here. The appraisal testimony offered to the Court on behalf of the plaintiff was of great value in the Court's ascertainment of market value. Mr. Heberger explained the basis upon which he computed the value of the property as a function of the comparable rental value of buildings in the area and an 84.6 percent occupancy. "The trial Court is well within its inherent discretion in adopting the estimate of value furnished by the plaintiff's appraiser." A M Realty v. Dahms, 217 Conn. 95, 101
(1991).
Therefore the Court finds Mr. Heberger's testimony both credible and relevant to ascertain the fair market value as of the date of the transfer of title and accordingly adopts the value of $2,695,000 as set by Mr. Heberger.
 II
The defendants have alleged the parties entered into an oral modification of the loan agreement and have interposed special defenses, as stated in their trial brief, as follows:
 ". . . that the plaintiff acted inequitably, specifically, "unconscionably," in making certain demands that constituted unilateral modifications of the agreements between them. The second, is the assertion made in paragraph 8, that the plaintiff acted in bad faith making the demands. Paragraph 9 reflects a claim that the plaintiff breached the implied covenant of good faith imbedded in the parties' agreements. Finally, paragraph 10 recites the plaintiff's actions as a breach of CUTPA." CT Page 7202
The plaintiff argues that these defenses are vague and are unsupported by the evidence.
The oral modification is claimed to be contrary to the loan documents and invalid on several grounds, including that it violates the statute of frauds and the parol evidence rule.
 III
The plaintiff argues that any oral modification of the loan terms, such as has been claimed by the defendants, would be invalid on several grounds.
 A.
The mortgages in question contain this language in ¶ 31:
 "Miscellaneous. This Mortgage may not be modified, amended, discharged or waived orally, but only by an agreement in writing and signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought."
The notes provide that "all agreements and provision in said mortgage are made a part hereof by reference." Such clauses have been upheld by our courts. Christensen v. Cutaia, 211 Conn. 613
(1989); S.H.V.C. v. Roy, 188 Conn. 503 (1992).
 C.
Still another hurdle for the defendants is Section 52-550(a), the Connecticut version of the statute of frauds. The plaintiff cites three sub-sections which appear robe relevant to this claim, viz:
 "(4) upon any agreement for the sale of real property or any interest in or concerning real property; or
 (5) upon any agreement that is not to be performed within one year from the making thereof; or CT Page 7203
 (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars."
Each of the foregoing provisions of the statute of frauds, prohibit the enforcement of a provision alleged in the defendants' Special Defenses. See also The Glastonbury Bank and Trust Companyv. Corbett Construction Co., Inc., 7 CSCR 1320, 1321 (12/7/92), (agreement to forbear from foreclosing a mortgage involves interest in real property and is within purview of statute of frauds and must be in writing).
 D.
The plaintiff also claims that the alleged oral modification is invalid because it lacks consideration. The defendants owed the debt, they gave nothing to the plaintiff, yet ostensibly received a reduction in the interest rate charged plus other considerations depending on which "agreement" is under consideration.
 "It is an accepted principle of law in this state that when a party agrees to perform an obligation for another to whom that obligation already owed, although for lesser remuneration, the second agreement does not constitute a valid, binding contract. See, e.g., Dahl v. Edwin Moss Son, Inc., 136 Conn. 147, 69 A.2d 562; Gruber v. Klein, 102 Conn. 34, 127 A. 907; Warren v. Skinner, 20 Conn. 559. "The basis of the rule is generally made to rest upon the proposition that in such a situation he who promises the additional compensation receives nothing more than that to which he is already entitled and he to whom the promise is made gives nothing that he was not already under legal obligation to give. 1 Williston on Contracts, § 130." Blakeslee v. Board of Water Commissioners, 106 Conn. 642, 652, 139 A. 106. Where, however, the subsequent agreement imposes upon the one seeking greater compensation an additional obligation or burden not previously assumed, the agreement, supported by consideration, is valid and binding upon the parties. See, e.g., Simone v. Kirschner, 100 Conn. 427, CT Page 7204 124 A. 20." (Emphasis added).
Brian Construction and Development Co. v. Brighenti, 176 Conn. 162,166 (1978).
 VI
Though the question of the validity of any alleged oral modification agreement has been dealt with, the Court must address the question, also raised by the plaintiff, of whether such an agreement was ever made.
The first writing referring to such an agreement is a letter, Exhibit 4, dated June 24, 1993 written to the plaintiff by the defendant Murano. In that letter, the defendants propose a "modification of the present mortgage rate and terms." The proposal includes:
 a. On the first note, a reduction in the interest rate to 6% with interest only to be paid monthly plus $4,400 per month to be paid on taxes, for a period of three years from August 1, 1993.
 b. Interest payments on the second note would be deferred for one year.
 c. $2500. a month would be paid on "past interest due."
In his Court testimony, Mr. Murano stated that the defendants received no response to the June 24 letter, but he thought they "had a deal" to pay 6% — on the whole loan, i.e., both notes. He could describe no other details of such an agreement.
The defendant Kowalski, who was supposed to have negotiated the terms contained in the June 24 letter, testified that he expected to pay 6% interest on the first note and nothing on the second note for a year.
Mr. Kowalski then stated that the plaintiff's response to his proposal (apparently that of June 24) was that if the account were made current, the plaintiff "would entertain that."
On July 30, 1993, the defendant Carrozzella wrote to the CT Page 7205 plaintiff (Exhibit 9) "to confirm negotiations between Mr. Kowalski and Mr. Ballantyne." He enclosed a check which brought the interest payments up to date and recited the "agreement reached" to the effect that "if the above amount (i.e., the interest) was paid by the end of the month the Bank in turn would modify the interest rate and all other terms of the two notes to 6% for a period of one year from and after July 5, 1993."
Actually, the account was not "up to date" and current as there were unpaid property taxes which the defendants were obligated to pay. Also, this July 30 statement of agreement was not the proposal contained in the June 24 letter. And Mr. Carrozzella testified that there were no discussions of a 6% deal in meetings with the plaintiff on June 24, July 1, and July 7. In fact, according to Mr. Kowalski, these meetings were held to discuss a re-structure of the two notes and their payment schedules and at these meetings the bank wanted the defendants to pay more money on the arrearages.
It should be noted that there is no writing or memo indicating the plaintiff agreed to any modification of the loans and an officer of the plaintiff stated on several occasions to one or more of these defendants that the bank had not agreed to any of their proposals. These denials stem, in part, from internal memos circulated by the plaintiff in which another bank officer states his disagreement with the defendants' claim that he agreed to a modification.
On these facts alone, the Court finds that there was no agreement by which the plaintiff modified the loan terms question.
The defendants also argued that though their recollections were imperfect and they were not in agreement as to the terms, they all knew the plaintiff's officer had agreed to "the 6% deal."
However, no explanation has been offered as to why, if they thought they "had a deal", the defendants stopped making payments pursuant to that deal. Payment was stopped on the check issued for the November 1993 payment and despite the urgings of the plaintiff, no further payments were made. Thus, on January 1, 1994, the second note became due, triggering a further default on the first note.
It is also difficult to rationalize the defendants' version of CT Page 7206 events with much of their testimony. For example, if indeed there were an agreed upon "deal for 6%," this deal would run for at least a year, whether it followed the June 24 letter or the July 30 letter. Nevertheless, both Mr. Carrozzella and Mr. Kowalski testified that at meetings on June 24, July 1, July 7, September 10, November 3, 11 and 18 a loan re-structure was the topic of discussion. But according to Mr. Kowalski, Mr. Ballantyne, on behalf of the bank, had agreed to the "deal" as early as June 10.
It is the conclusion of the Court that at no time did the plaintiff bank agree to any modification of the terms and conditions of the two notes and mortgages. There was no meeting of the minds and the Court concludes that there was no such agreement.
 V
The defendants have argued that the plaintiff bank "set them up" to make a foreclosure possible. This claim lacks any evidential basis whatsoever. The defendants constructed the project in this litigation with mortgage proceeds furnished by the plaintiff. When they were hopelessly in default, they came to the plaintiff for assistance. Had a foreclosure been the goal of the plaintiff, no further steps had to be taken — the loan was in default at that point in 1991. Instead of foreclosing, the plaintiff re-financed the project in the form of two mortgages.
Though this re-financing was first alluded to as part of a scheme to hurt the defendants, on oral argument, the defendants stated "the two mortgages are not sinister." The Court concurs. They represented a generous gesture on the part of the plaintiff.
The defendants have also portrayed themselves as victims of the plaintiff who "set them up for a fall," egging them into a loan agreement the bank knew they couldn't honor. To expect the Court to accept this premise is to stretch the bounds of credulity. Of the defendants who testified, one is a member of the bar for some 30 years or so with a wide practice. His financial statement indicates experience in real estate investing. Another defendant has been a realtor for 30 years with extensive experience in commercial real estate and real estate investing. And, as noted above, there was no need to "set them up" for this foreclosure as they could have been foreclosed upon in the original loan obligation.
The defendants made unproven claims that the plaintiff had CT Page 7207 agreed, again orally, that there would be no foreclosure of these two mortgages and a re-financing would be accomplished. In his deposition and in his trial testimony, Mr. Kowalski admitted no such assurances were made when the mortgages were closed.
The defendants have also characterized the plaintiff's actions in considering a loan re-structure as an example of bad faith. The plaintiff here insisted that the loan be made current before a restructure would be considered, hardly an unreasonable demand in view of the defendants' default and unwillingness to come up with the money they owed and which their financial statements stated they had.
The defendants also bemoan the plaintiff's action in commencing this foreclosure in light of their "de minimis payments failures." The defendants had paid nothing on their loans in three months and owed real property taxes for a full year. Another tax payment was due in January of 1994 so that $135,000 was then due. The defendants had been collecting the rents from their tenants in the interim.
There is also a claim that the plaintiff demanded "inappropriate additional security." This apparently refers to the testimony of Mr. Carrozzella. The plaintiff wanted $500,000 and mortgages on the defendants' homes, as a condition of restructuring after default on a loan with a principal indebtedness in excess of four and a half million dollars. In a real estate market that was in dire straits, Mr. Kowalski testified that his efforts to sell or re-finance this property had failed to elicit an offer at five, four, or even three million dollars.
Tied to this claim is the failure of the plaintiff to refinance "the project as expected." Again, there is no evidence to support this "expectation." The plaintiff did refinance the original mortgage. The bank was prepared to refinance yet again, but on stricter terms after the defendants had defaulted yet again, after only four months.
The Court does not find any of these acts of the plaintiff to have been made in bad faith, nor does it find any CUTPA violation. With the defendants unwilling to apply their own resources to salvage their investment, the behavior of the bank can hardly be characterized as "inequitable." Business decisions had to be made and the bank made them, extending more than average courtesy and cooperation to these defendants. CT Page 7208
It should be noted that the alleged "demands for further security and payments "which occurred after the loan was in default and during discussions of re-financing were actually in the nature of settlement discussions. As such they are not admissible in this proceeding. Tomasso Bros., Inc. v. October Twenty-Four, Inc.,221 Conn. 194, 198 (1992).
However, the Court heard no evidence that the plaintiff made "certain demands that constituted unilateral modifications of the agreements between them." The additional security, if requested, was part of the re-financing discussions after default. The requirement that the account be made current before re-structuring could be entertained was not a modification of the agreement — again, the loans were in default and the sums demanded were long overdue.
A further comment on the defendants' closing argument is appropriate. It was stated that the plaintiff "knew the building couldn't carry itself," apparently suggesting that the plaintiff should not have refinanced in 1992! The argument then went to say "the bank changed its mind", thus not acting in good faith. Since the Court has concluded there was no oral modification, this argument is irrelevant. But, the defendants' admission that the plaintiff was willing to assist these defendants to refinance by forgiving $500,000 of the debt further negates the claim of bad faith on the part of the plaintiff.
The issue of the good faith duty of a lender and the application of this claim as a Special Defense has been addressed by our Courts. In Centerbank v. Motor Inn Assoc.,9 Conn. L. Rptr. 505
(9/6/93, Thompson, J.), this Special Defense was found wanting:
 "[i]t is difficult to conceive of how the institution of a foreclosure action against a defaulting party, even in the midst of workout discussion, can constitute a breach of the covenant of good faith and fair dealing. Certainly, such discussions are to be encouraged and to so hold would have the opposite effect."
Id. at 506.
VI
CT Page 7209
The plaintiff has asserted additional legal claims to the defendants' Special Defenses.
 A.
The plaintiff argues that CUTPA is not a legally recognized Special Defense but must be asserted in a separate action. This evolves from the general principal that: "The policy behind CUTPA is to encourage litigants to act as private attorneys general and to bring actions for unfair and deceptive trade practices." (Citations omitted).
The Court agrees with this argument, but since the Court found that no CUTPA claim has been substantiated, and the case was tried with the alleged CUTPA violation interposed as a Special Defense, this issue need not be addressed further.
 B.
The defendants' last Special Defense is a general statement that the plaintiff's actions were a breach of CUTPA.
The Court did not find that the plaintiff unilaterally modified the loan agreement, nor that it acted in bad faith in requesting additional security as a condition of a re-financing. The Court did find that it acted in good faith in adhering to the terms of the agreement.
There is no basis upon which it can be found that the plaintiff's actions were immoral, unethical, oppressive or unscrupulous, offend public policy or implicate the concept of unfairness, or cause the type of substantial injury that CUTPA was designed to address. Normand Josef Enterprises, Inc. v.Connecticut National Bank, 230 Conn. 486, 522 (1994). (Citations omitted).
 C.
The parties are in disagreement as to whether or not the "equitable defenses" raised by the defendants should be considered by the Court in a foreclosure action.
In view of the manner in which this case was pleaded and tried, the Court has considered them all, rendering it unnecessary CT Page 7210 to resolve this question.
CONCLUSION
The defendants have not questioned any of the figures or computations reflected in the "Plaintiff's Calculations of Deficiency," dated May 18, 1995. Only in closing argument was the appraisal questioned (Section I, supra).
A deficiency judgment may enter as follows:
The indebtedness is found to be $4,715,473.57
 The value of the property is found to be $2,695,000, subject to a tax lien of $131,159.32, for a net value of 2,563,840.68
The deficiency is found to be* 2,151,632.89
 The plaintiff is awarded attorneys' fees and costs in the net amount of 101,529.08
Plus an appraiser's fee of 5,000.00
 And the appraiser's fee for Court testimony of 600.00 ------------ Total deficiency $2,258,761.97 Anthony V. DeMayo State Trial Referee