[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant proceeding arises out of a construction contract, more specifically in this instance, the excavation, and installation of sewer and water service on a project which was to be known as Gaslight Village in Danbury, Connecticut. Castlemen, Inc. was in the business of construction management and, in 1988, was so involved in a tract of land owned by Tamarack Village Associates. General partners of Tamarack Village Associates were Marius Prezioso, Raphael Prezioso and Casazzone Development, Inc., whose president, Ralph Casazzone, was the individual CT Page 5775 defendant in this action. The officers and shareholders of Castlemen were the brothers Prezioso.
Raphael Prezioso, acting on behalf of Castlemen, solicited contractors to work on the project including, without limitation, the installation of sewer and water facilities both on the site and off the site. Sweeney responded to the solicitation with a written proposal dated March 4, 1988, which was accepted by Castlemen on March 29, 1988. The two page contract referenced four sets of drawings and was signed by both Castlemen's and Sweeney's representatives. The contract price called for payment of nine hundred forty thousand ($940,000) dollars to Sweeney.
Sweeney began its work, submitted its first application for payment at the end of April, 1988, and was paid in full on that first application in May of that year. The same format occurred in June and July of 1988, and the applications for payments were rendered for each of the months worked. These invoices were promptly paid. Each of the first three invoices, which totalled two hundred six thousand six hundred fifty-five ($206,655) dollars, were paid by a personal check of Ralph Casazzone. This leads to the inference that Tamarack did not then have a financial commitment to fund the building of the project. In addition, it did not have its sewer and water permits for the work which was to be accomplished by Sweeney. The lack of those permits caused unanticipated, substantial delays. As a result, the principals of Sweeney met with the Preziosos to discuss terminating the contract mutually and proceeding on a time and material basis. This was to the mutual advantage of Castlemen and Sweeney, as Castlemen would be permitted to bid out certain portions of the work covered by the so-called contract and Sweeney thereafter gave it a 10 percent discount from its standard rates. Subsequently, Sweeney changed its billing practices by reviewing the monthly time and material billing with Raphael Prezioso, making agreed upon changes, and sending an agreed upon application for payment with the discounted time and materials summary attached.
Precious little work occurred through the end of 1989, as the sewer route and the necessary permit were not settled. The project became rejuvenated in 1990, when the permit and the route of the sewer were finally determined. In 1990, Sweeney's standard rates had once again increased. To meet Raphael Prezioso's objection to the increased rates, Sweeney agreed to increase his discount from 10 percent to 11.5 percent. Castlemen agreed to pay CT Page 5776 the higher rates, and the first billing and subsequent billings in 1990 reflect this agreement.
Two events significant to this case occurred shortly thereafter. The first was the chaos created in the real estate market by its collapse, and the second was the fact that Castlemen's payments began to become later and later and the balance due grew and grew. The final payment made was on February 28, 1991, and it was in the amount of two thousand ($2000) dollars. In March, 1991, Sweeney left the job and filed a mechanic's lien against the premises. The reasonable value of the labor, machinery and material for which Sweeney was unpaid by Castlemen totals two hundred fifty-nine thousand four hundred fifty-nine dollars and forty-three cents ($259,459.43). In February, 1993, the Prezioso brothers and Ralph Casazzone renegotiated their relationship so that the Preziosos took over the affairs of Castlemen, and Casazzone became the sole owner of Tamarack. As part of this arrangement, on August 26, 1993, Tamarack transferred its interest in Unit 112 and garage units G-1-7 and G-1-8 to the defendant, Edgewood Associates, a limited partnership, an entity owned and controlled by the Preziosos. On April 11, 1994, the case was withdrawn as to Casazzone.
At the time of the transfer, Tamarack owned only one other unit, designated as No. 202, on which it subsequently placed a seventy-five thousand ($75,000) dollar mortgage to a plumbing contractor in payment of a debt owed to it for corrective work or completion of Sweeney's obligations. Raphael Prezioso admitted that the consideration for the transfer of Unit 112 and garage units G-1-7 and G-1-8 was for the "years of service" by himself and his brother Marius. Raphael and Marius Prezioso were both insiders as defined by Sec. 52-552b(7)(c) of the General Statutes. At the time of the transfer, Tamarack had no other assets and had substantial debts including the debt to Sweeney.
Tamarack transferred its interest in the said property as aforesaid with the intent to avoiding payment of the debt owed to Sweeney, and with the accompanying intent of hindering Sweeney's ability to collect said debt by preventing said property from being attached and levied upon by legal process. As a result of transferring away the properties to Edgewood and the incumbrance of Unit 202 by the mortgage, Tamarack effectively became insolvent. These conveyances were ultimately calculated to preclude the satisfaction of any judgment in Sweeney's favor, all in violation of sections 52-552a to 52-552l of the General CT Page 5777 Statutes. The conveyances are, accordingly, set aside as Unit 112 and to Unit 202 upon which the subject mortgage was granted. However, Unit 202 remains subject to the mortgage held by Ellul offered to secure payment for repair or creation of the retention ponds and the correction of other siltation problems.
The defendants claim that much of the work was unacceptable, improper and required corrective actions by other providers. However, the difficulty in accepting that version is that there was never a written letter of or oral complaint to Sweeney, and its bills were paid until the project exceeded the financing commitments. Castlemen (Raphael Prezioso) offered statements from other service providers purportedly representing moneys paid by Castlemen to correct what it claims were mistakes, defects or damages caused by Sweeney to the project. However, no witnesses to substantiate any general or specific claim ever were called and none of these statements or bills ever came into evidence and, as such, are useless to the court.[1]
The defendants have seized upon the fact that the original contract entered into between the parties required any modifications, or changes or additional work be in writing. There is no question that changes did occur and these changes were oral. It is also clear that the plaintiff bears the burden of proving that the parties clearly intended to modify the existing contract. Malone v. Santora, 135 Conn. 286, 291; Matter ofNortheast Resources, Inc., 21 B.R. 109 (Bankruptcy Conn. 1982).
The defendants continue by reciting that a modification agreement must be supported by a valid consideration and requires a party to do or promise to do something further than or different from that which it is already bound to do. Thermoglaze,Inc. v. Morningside Gardens Co., 23 Conn. App. 741, 745; see e.g., Dahl v. Edwin Moss Son, Inc., 136 Conn. 147, 155. Therefore, what, if any, was the consideration for this modification if indeed there was such a modification. There is very little question as to what Sweeney's obligation was under the original contract. However, in the absence of the necessary permits, and the absence of the extremely important location of the sewer work, the contract indeed became vague and ambiguous with respect to those two items. Because of the necessary uncertainty, Sweeney's obligation became somewhat clouded, if not incomprehensible. It had virtually no idea where the location of the connection to the initial sewer system was going to be nor the route to the municipal system. That relocation of the route CT Page 5778 obviously was a change of substantially more work than Sweeney was obligated to do. The conversion of the contract to a time and material basis for Sweeney's efforts, and the agreement to proceed with additional excavation and the accompanying expense, material and equipment over a much larger, unanticipated route constituted consideration for Sweeney's participation in the modification. The advantage or consideration to Castlemen was the discount the presubmission of the charges for the work that was accomplished by Sweeney throughout this period, and the opportunity to "edit" the charges and reasonably reduce them if Castlemen believed the charges were unreasonable. Therefore, this court is quite satisfied that the original contract was indeed modified by the parties. In addition, this finding is further supported by the fact that until such time as the financing commitment and funds became scarce, the bills submitted by Sweeney under this modification were immediately paid by Castlemen.
Credibility is a problem for the court in this case as it finds neither of the principals to be completely reliable, completely truthful and completely believable. It is constrained to note that the plaintiff's evidence is more credible than the defendants' and, on said credibility, the court finds the basis for its decision. It finds Sweeney has established its right to the payment of two hundred fifty-nine thousand four hundred fifty-nine dollars and forty-three cents ($259,459.43), and that Castlemen is entitled to a credit of seventy-seven thousand ($77,000) dollars against that amount, bringing the balance due and payable to the plaintiff to one hundred eighty-two thousand four hundred fifty-nine dollars and forty-three cents ($182,459.43).
Sweeney has claimed interest and counsel fees. The court finds that the debt was not liquidated and not subject to the award of interest. The modification approached a novation, if indeed it is not one, and whether that occurred or not, there was no provision in the modification permitting the award of counsel fees.
Judgment may enter, accordingly.
Moraghan, J.